### 43481. CHANCEY v. THE STATE.
### 43482. JORDAN v. THE STATE.
### 43483. CAGLE v. THE STATE.
#### (349 SE2d 717)

MARSHALL, Chief Justice.

The appellants in this case are Harold S. Chancey, Audie Jordan, and Charles I. Cagle. On August 24, 1982, the Walton County Grand Jury returned a 5-count indictment. Count 1 charged appellants, and

others, with the offense of violating the "Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act." OCGA § 16-14-1 et seq. Counts 2 through 5 charged appellant Harold Chancey, as well as Ruth Chancey and Bobby Gene Goswick, with murder and arson. Ruth Chancey's motion for severance was granted, and the trial court subsequently declared a mistrial on the murder/arson charges as to Goswick and Harold Chancey. Appellants were each convicted of violating the RICO statute; they were each fined, and in addition they were each given a sentence of 20 years' imprisonment. They appealed, arguing, among other things, that the RICO statute is unconstitutional.

## I. *The Act*

The Georgia RICO Act (OCGA § 16-14-1 et seq.) is patterned after the federal RICO statute. 18 USC § 1961 et seq. The federal statute was enacted as Title IX of the Organized Crime Control Act of 1970. Although the state Act is patterned after the federal Act, there are differences between the two statutes.

The overriding purpose of the federal RICO statute is to deal with the problem of the infiltration of organized crime into all areas of American life through the money derived from its illegal endeavors. The provisions of RICO are intended to repair "defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime . . ." *United States v. Turkette*, 452 U. S. 576, 589 (101 SC 2524, 69 LE2d 246) (1981); *United States v. Angelilli*, 660 F2d 23, 32 (2nd Cir. 1981).

Similarly, the Georgia RICO statute was enacted because of "a severe problem . . . posed in this state by the increasing organization among certain criminal elements and the increasing extent to which criminal activities and funds acquired as a result of criminal activity are being directed to and against the legitimate economy of the state." OCGA § 16-14-2 (a). Consequently, the expressed intent of the Georgia statute "is to impose sanctions against this subversion of the economy by organized criminal elements and to provide compensation to private persons injured thereby. OCGA § 16-14-2 (b). However, § 16-14-2 (b) goes on to state that "[i]t is not the intent of the General Assembly that isolated incidents of misdemeanor conduct be prosecuted under this chapter but only an interrelated pattern of criminal activity, the motive or effect of which is to derive pecuniary gain. This chapter shall be construed to further that intent."

The activities prohibited by the federal RICO statute are set out in subsections (a) through (d) of 18 USC § 1962. Subsection (a) makes

it "unlawful for any person who has received any income derived, directly or indirectly, from" what is termed a "pattern of racketeering activity . . . in which such person has participated as a principal" to "use or invest, directly or indirectly, any part of such income . . . in acquisition of any interest in, or the establishment or operation of, any enterprise . . ." Under subsection (b), it is "unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise . . ." Under subsection (c), it is "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." Finally, subsection (d) of § 1962 makes it unlawful to conspire to violate any of the provisions of subsections (a), (b), or (c).

18 USC § 1961 (1) defines "racketeering activity" as encompassing various specified criminal offenses, e.g., murder, gambling, arson, dealing in narcotic or other dangerous drugs, wire fraud, securities fraud. "Enterprise" is defined under subsection (4) of § 1961 as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Under subsection (5), " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] . . ."

"In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute . . . The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other." *United States v. Turkette*, supra, 452 U. S. at p. 583.

The "prohibited activities" under the Georgia RICO statute are set out in OCGA § 16-14-4. Subsection (a) makes it "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Under subsection (b), "[i]t is unlawful for any person employed by or associated with any enterprise to con-

duct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." Subsection (c) provides that "[i]t is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section."

The Georgia RICO statute is significantly broader than its federal counterpart in that OCGA § 16-14-4 (a) makes it unlawful for any person through proceeds derived from a pattern of racketeering activity to acquire or maintain any real property, or personal property of any nature, including money. In contrast, the federal RICO statute, 18 USC § 1962 (a), only targets investors who participate in the pattern of racketeering activity as a principal. See "Georgia Racketeer Influenced and Corrupt Organizations Act," 20 Ga.BarJ. 34 (1983). And, 18 USC § 1962 (b) only makes it unlawful for any person through a pattern of racketeering activity to acquire or maintain any interest in or control of an enterprise; the federal statute does not contain a proscription against the acquisition of real and personal property, including money, which is not part of the enterprise.

The forfeiture provisions of the state and federal statutes are, likewise, different. Cf. 18 USC § 1963 (a), with OCGA § 16-14-7 (a).

However, as previously stated, the federal RICO statute, 18 USC § 1962 (c), and the state statute, OCGA § 16-14-4 (b), are similar in that the foregoing core provisions both make it unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

In one respect, the Georgia RICO statute is narrower than the federal statute, in that OCGA § 16-14-3 (2) defines "pattern of racketeering activity" as "at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after July 1, 1980 . . . ." The federal RICO statute, of course, requires a connection between the racketeering activity and the enterprise, but it does not on its face require any interrelatedness between the predicate crimes themselves. See *United States v. Elliott*, 571 F2d 880, 899, note 23 (5th Cir. 1978).

The Georgia RICO statute broadly defines "enterprise" to mean "any person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity . . . and it includes illicit as well as licit enterprises and governmental as well as other entities." OCGA § 16-14-3 (1). The federal RICO statute does not expressly state that the term "enterprise," as used therein, includes illicit as well as licit enterprises. However, the United States Supreme Court has interpreted RICO as including both. *United States v. Turkette*, supra.

The Georgia RICO statute's venue section provides that in any criminal RICO proceeding "the crime shall be considered to have been committed in any county in which an incident of racketeering occurred or in which an interest or control of an enterprise or real or personal property is acquired or maintained." OCGA § 16-14-11.

The remaining provisions of the state and federal RICO statutes are not applicable here and, therefore, will not be reviewed.

## II. *The Facts*

The racketeering activity in this case consists, for the most part, of a drug-importation-and-distribution enterprise, the principals of which were the appellants. The key witnesses were Barbara Bell, who is appellant Chancey's former paramour; Diana Jordan, who is appellant Jordan's former wife; and Jody Cagle, who is appellant Cagle's former wife. However, their testimony as to the existence of the enterprise was corroborated in material part by the testimony of other witnesses. There was also some documentary evidence.

The predicate acts consist, for the most part, of offenses of simple drug possession, drug possession with intent to distribute, and drug sales, as well as conspiracies and attempts to commit the foregoing offenses. No drugs confiscated from the appellants or alleged to be part of the enterprise were introduced.

The evidence authorized the jury in finding the following:

Beginning in 1977, Chancey and Cagle began to purchase large quantities of marijuana for sale and distribution.

Beginning in 1978 or 1979, Jordan began working for Chancey and Cagle. He would make frequent trips to Florida, where he would purchase cocaine and marijuana with the money entrusted to him by Chancey and Cagle. The individuals with whom the appellants did business in Florida were referred to as "the Cubans," two of whose names were Hector and Caballero. In 1979, Jordan and Cagle met with the Cubans in Savannah to coordinate the importation of drugs into this state by boat. Jordan and Cagle would also make trips to Florida for the purpose of purchasing illegal drugs for importation back into Georgia.

In the summer of 1979, Cagle and his wife brought a load of marijuana to Cagle's lake house in northern Georgia. Chancey and Jordan met them at the lake house. Jordan brought a pound of cocaine to the lake house, along with scales, and he "cut" the cocaine with a substance called mannitol. Parts of the uncut cocaine were given to Cagle and Chancey. All three of them were observed using the cocaine at the lake house.

Several witnesses testified as to repeated instances of cocaine usage, primarily by Chancey and Cagle, but by Jordan as well. Specifi-

cally, the testimony of Barbara Bell was that she repeatedly saw Chancey use a white, powdery substance, which he described as cocaine, and he used this substance by "snorting" it into his nose through a straw. She also described his change in behavior after using the substance. The evidence showed that the cocaine used by the appellants was taken from shipments they were importing into this state.

Introduced in evidence was a ledger sheet, which the state characterizes as a "fundamental piece" of state's evidence. This ledger was written in Jordan's handwriting, and it was seized from Cagle's lake house. It was identified as essentially a profit-and-loss statement of a major drug transaction. It primarily implicated the appellants. Telephone records also showed extensive telephone contact between the appellants during the relevant time periods.

From 1979 through November 1980, Jordan made deliveries of large quantities of marijuana and cocaine to a service station and "stash house" owned by George Amerson in Atlanta, Georgia. On some occasions he was accompanied by a man Jordan referred to as his boss, a man through whom he had to obtain authorization for revisions in drug prices. The man, who would walk around Amerson's station snorting cocaine, was called "Mountain Man," "Frog Man," and "Bug Eye." These are monickers attributed to Cagle.

There was also testimony that Barbara Bell and Jody Cagle would hold large sums of money given to them by Chancey and Cagle, respectively, and that they would use parts of these funds to defray the expenses of maintaining their homes. Likewise, Diana Jordan testified that she used money given to her by appellant Jordan after he would return from Florida to pay the mortgage on their house. On one occasion in 1979, all three appellants picked up approximately $384,000 from a suitcase being held by Jody Cagle in order to buy marijuana in Florida. Cocaine users testified to purchases of cocaine from Chancey and Cagle. There was testimony that Chancey used barns on his property to stash marijuana.

### III. *The Appeal*

There are other facts which will be developed in considering the enumerations of error raised.

1. In Jordan's and Cagle's first and eighth enumerations of error, and in Chancey's third enumeration of error, they argue that the evidence is insufficient to support the verdict.

(A) Chancey's argument that the evidence is insufficient to support his conviction is centered on the fact that the only post-1980 predicate act as to which the jury found him guilty involved repeated attempts to possess and use cocaine from January 1, 1980, through

March of 1982 at the house maintained for Barbara Bell.

Based on this, Chancey asserts essentially three arguments: Firstly, Chancey argues that the state has shown no connection between the cocaine-possession offense and an "enterprise" or a "pattern of racketeering activity." Secondly, he argues that this cocaine-possession offense was proved through Barbara Bell's testimony as statements made to her by Chancey; thus, Chancey maintains that these statements were in the nature of confessions, which were not corroborated as required by OCGA § 24-3-53. Lastly, he contends that there has been no proof of the corpus delicti of the crime of cocaine possession. For the following reasons, we find all of these arguments to be without merit.

(a) The evidence amply authorized the jury in finding that the cocaine chronically used by Chancey until at least March of 1982 was taken from shipments of cocaine imported by him and the others into the state. Thus, the state's evidence did establish a connection between the cocaine-possession offense and the enterprise. However, even assuming for the purposes of argument that Chancey's § 16-14-4 (b) RICO conviction was not sustainable, his RICO conviction would be alternatively sustainable under § 16-14-4 (a), and he does not attack the sufficiency of the evidence to support his conviction under subsection (a).

(b) The proof of appellant Chancey's cocaine possession, or attempted cocaine possession, at the house maintained for Barbara Bell, came primarily through Barbara Bell's testimony with respect to her observations of Chancey's behavior, not her testimony concerning any confession made by him to her.

(c) We do not disagree that failure of the prosecution in a drug-possession case to introduce physical samples of the drug allegedly possessed does raise substantial questions with respect to whether the evidence is sufficient to authorize a verdict of guilty. See generally *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

However, in our opinion the absence of such proof does not lead ineluctably to the conclusion that there has been no proof of corpus delicti. The abstruse concept of corpus delicti has been described by the commentators as "often misunderstood." LaFave & Scott, Handbook on Criminal Law, p. 16 (1972). Corpus delicti requires that, in a homicide prosecution, the state prove that a death occurred; there is, however, no inflexible requirement that a dead body be produced. Likewise, the concept of corpus delicti requires that in a drug-possession case there be proof by the state that the defendant possessed (or perhaps attempted to possess) the illegal drug; however, there is no invariable requirement that in every such case, the drug itself be produced.

Here, as previously stated, there was testimony that witnesses

had seen appellant Chancey use a white, powdery substance in a manner in which cocaine is used, and there was testimony as to his change in behavior after such use. This constitutes at least circumstantial evidence supporting the cocaine-possession charge. Under the facts of this case, we find appellant's argument that there was no proof of corpus delicti to be without merit.

(B) Jordan's and Cagle's arguments with respect to the sufficiency of the evidence are basically the same. Firstly, they argue that the evidence was insufficient to establish their association with an enterprise or their participation in such enterprise through a pattern of racketeering activity. Secondly, they argue that the state case is devoid of any evidence that any predicate acts took place after July 1, 1980. We find both of these arguments to be without merit.

We note at the outset that Jordan was charged with, and convicted of, violating § 16-14-4 (a), as well as § 16-14-4 (b), and he does not challenge the sufficiency of the evidence to support his conviction under subsection (a). Cagle was charged with violating § 16-14-4 (b), but he was not charged with violating § 16-14-4 (a).

(a) The testimony of the witnesses, supported by the documentary evidence, was sufficient to show that Jordan, Cagle, and Chancey were involved in the importation of large quantities of cocaine and marijuana into this state. The evidence is sufficient to support their convictions of participating in this criminal enterprise through a pattern of racketeering activity.

(b) Testimony of various witnesses established that, as late as the fall of 1980, Jordan was still making trips to Florida and delivering marijuana to George Amerson. The testimony showed that Cagle's wife did not leave him until the last week of July 1980; and that his cocaine abuse, and his involvement in the importation and distribution of illegal drugs, continued at least until that time. Thus, the evidence amply supports the jury's findings of the commission of predicate crimes by both Jordan and Cagle after July 1, 1980.

2. In Jordan's and Cagle's second enumeration of error, and in Chancey's fourth enumeration of error, they argue that the trial court erred in denying their special demurrers to the indictment.

Appellants' complaint here is that the allegations with respect to the predicate acts in the RICO count of the indictment did not provide them with adequate notice due to a failure to allege dates, a failure to name co-conspirators, and a failure to identify the place of the occurrence of the acts.

As authority in support of their argument, appellants cite only to the rule, applied in cases exemplified by *Conley v. State*, 83 Ga. 496 (10 SE 123) (1889), that in a prosecution for a crime the indictment must allege that the crime was committed in the county where the prosecution is proceeding. See also *State v. Ramos*, 145 Ga. App. 301

(243 SE2d 693) (1978). The reason for this rule is that, under the Georgia Constitution, a person accused of a crime shall be tried in the county where the crime was committed. *Conley v. State*, supra.

Here, subpart I of Count 1 of the indictment charged appellants Chancey and Jordan with violating OCGA § 16-14-4 (a) by maintaining various described parcels of real property located in Walton County; and they were also charged with possession of certain described vehicles, as well as possession of currency in various described amounts, in Walton County during time periods set out in the indictment.

In subpart II of Count 1, it was alleged that the commission of specific criminal acts on specific dates, or within various time periods, established that the appellants were guilty of the conduct of, or the participation in, an enterprise through a pattern of racketeering activity, in violation of OCGA § 16-14-4 (b). As previously stated, the predicate acts listed in subpart II involve, for the most part, instances of drug possession, sales of drugs, and various conspiracies relating to drug possession and sale. As to some of these predicate acts, the place of occurrence is not alleged; as to others, it is specifically alleged that they took place in Walton County.

Contrary to appellants' argument, notwithstanding the fact that all of the numerous predicate acts were not committed in Walton County, the indictment did sufficiently allege the maintenance of interests in property, and the conduct of an enterprise through a pattern of racketeering activity, in Walton County. In addition, the offense with which the defendants were charged was "so stated as to give [them] ample opportunity to prepare [their] defense." *Allen v. State*, 120 Ga. App. 533, 534 (2) (171 SE2d 380) (1969). The trial court did not err in denying the special demurrers.

3. In Jordan's and Cagle's third enumeration of error, and in Chancey's fifth enumeration of error, they argue that, in various instances, the trial court committed reversible error in improperly limiting defense counsel in their questioning of prospective jurors on voir dire examination.

"Voir dire should allow both parties an opportunity to ascertain the ability of the prospective jurors to decide the case on its merits, with objectivity and freedom from bias and prior inclination. *Whitlock v. State*, 230 Ga. 700 (198 SE2d 865) (1973). However, no question should require a response from a juror which might amount to a prejudgment of the case. *Jones v. Parrott*, 111 Ga. App. 750 (2) (143 SE2d 393) (1965). Since the distinction between questions which ask jurors how they would decide issues of a case if and when such issues are presented and questions which merely inquire whether jurors can start the case without bias or prior inclination is not always crystal clear, the 'control of the voir dire examination is vested in the sound

legal discretion of the trial judge and will not be interfered with by this court unless the record clearly shows an abuse of that discretion.' *Lamb v. State*, 241 Ga. 10, 12 (243 SE2d 59) (1978)." *Waters v. State*, 248 Ga. 355, 363 (3) (283 SE2d 238) (1981).

"OCGA § 15-12-133 . . . provides: 'In the (voir dire) examination, the counsel for either party shall have the right to inquire of the individual jurors examined touching any matter or thing which would illustrate any interest of the juror in the case, including any opinion as to which party ought to prevail, the relationship or acquaintance of the juror with the parties or counsel therefor, any fact or circumstance indicating any inclination, leaning, or bias which the juror might have respecting the subject matter of the action of the counsel of parties thereto, and the religious, social and fraternal connection of the juror.' While the language of the statute is broad, the trial judge retains the discretion to limit the examination to questions dealing directly with the specific case and to prohibit general questions. *Williams v. State*, 249 Ga. 6 (1) (287 SE2d 31) (1982); *Hill v. State*, 221 Ga. 65 (142 SE2d 909) (1965)." *Chastain v. State*, 255 Ga. 723, 724 (1) (342 SE2d 678) (1986).

(A) First, appellants argue that the trial court placed limitations on defense counsel's questioning of prospective jurors in violation of *Craig v. State*, 165 Ga. App. 156 (299 SE2d 745) (1983).

In *Craig*, the appellant was convicted of the offense of trafficking in cocaine. The Court of Appeals reversed the conviction on the ground that the trial court erred in not allowing defense counsel to ask prospective jurors the following two questions on voir dire examination: "Have you or any of your children ever been a victim of a drug transaction?" "Has any member of your family ever had any problems with drugs?"

Here, defense counsel requested to be allowed to propound both of these questions, and the trial court allowed the former question, but disallowed the latter. However, the trial court also allowed defense counsel to ask prospective jurors whether they had ever been associated with anyone who had ever had any problems with drugs, and whether anything personal to them would affect their ability to sit in judgment on a case involving drugs.

Thus, the substance of the requested questions was allowed to be asked to prospective jurors. Even under *Craig*, we find no reversible error.

(B) Second, appellants complain of certain instances in which comments by the trial judge, as well as limitations placed on defense counsel's questioning of prospective jurors, resulted in an inability on defense counsel's part to elicit the disclosure of juror bias and prejudice against the appellants.

(a) The complained-of comments by the trial judge consist of ad-

monitions expressed to prospective jurors with respect to their oath as jurors requiring them to decide the case based on the evidence and law, the presumption of innocence, and the requirement that the state prove guilt beyond a reasonable doubt. These admonitions were given after prospective jurors had given an affirmative response to the statutory voir dire question as to whether they had formed and expressed any opinion in regard to the guilt or innocence of the accused. OCGA § 15-12-164 (a) (1).

"In order to disqualify a juror for cause, it must be established that the juror's opinion was so fixed and definite that it would not be changed by the evidence or the charge of the court upon the evidence. *Sullens v. State*, 239 Ga. 766 (1) (238 SE2d 864) (1977)." *Westbrook v. State*, 242 Ga. 151, 154 (3) (249 SE2d 524) (1978). "The law does not set an impossible standard on the state to obtain jurors completely free 'of the mere existence of any preconceived notion as to the guilt or innocence of an accused . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' *Irvin v. Dowd*, 366 U. S. 717, 723 (81 SC 1639, 6 LE2d 751) (1961). 'Qualified jurors need not . . . be totally ignorant of the facts and issues involved.' *Murphy v. Florida*, 421 U. S. 794, 799 (95 SC 2031, 44 LE2d 589) (1975)." *Baker v. State*, 245 Ga. 657, 660 (266 SE2d 477) (1980). In view of this, we find no error here.

(b) The appellants' complaint, that the trial judge imposed undue limitations on defense counsel's questioning of prospective jurors, fails to withstand scrutiny upon a review of the specific instances of which appellants complain.

Specifically, appellants complain of the limitations placed on defense counsel's voir dire questioning of Ms. Jack Short, Savannah Smith, Joyce Adams, Thelma Jean Davis Brown, Mrs. A. P. Fambrough, and Michael Eugene Sorrells.

After being questioned on voir dire, Ms. Short was in fact excused for cause due to bias against the appellants. From our review of the transcript, we find that the trial court merely prohibited defense counsel from asking Savannah Smith repetitive questions as to whether she had formed any opinion as to the defendants' innocence. After defense counsel asked Joyce Adams whether she presumed appellant Chancey to be innocent "at this time," the trial court merely reminded her that, under the law, a criminal defendant is presumed innocent until proven guilty beyond reasonable doubt by the state. Contrary to appellant's argument, the trial court did allow defense counsel to ask Thelma Brown whether it was her opinion that appellant Chancey was in the "Dixie Mafia"; and although the trial court did not allow counsel to ask her whether the information she had received with respect to Chancey's involvement in the Dixie Mafia came

from friends of hers, counsel was allowed to ask this prospective juror whether she put credence in this information. Our review of the portion of the transcript cited to by appellants reveals no limitations placed on defense counsel's questioning of Mrs. A. P. Fambrough. As to Michael Eugene Sorrells, we find that the trial judge merely prohibited repetitive questioning of him.

(C) Appellants argue that they were denied an opportunity to inquire into prospective jurors' unwillingness to serve on the jury, or their ability to answer voir dire questions candidly, as a result of their fear of the appellants.

In advancing these arguments, appellants cite extensively to the transcript. However, the portions of the transcript cited by them contain voir dire testimony showing that there did exist among many of the members of the community a fear of serving as a juror in this case. Appellants have not cited to portions of the transcript wherein requests of theirs for voir dire questioning were denied. Consequently, we find no merit in this enumeration of error.

(D) Appellants argue that in certain instances they were prohibited from asking prospective jurors questions with respect to preconceived opinions they had formed in regard to appellants' guilt.

Upon review of the specific instances complained of, we find no error. As previously stated, the trial court ultimately allowed defense counsel to ask Thelma Brown whether it was her opinion that appellant Chancey was in the "Dixie Mafia." Whether or not the trial court erred, in refusing to allow defense counsel to ask Thelma Brown whether she could serve as an impartial juror in the case of co-defendant Bobby Gene Goswick, is a moot question, in that he is not an appellant herein. Contrary to appellants' suggestions, they were not prohibited from asking questions on voir dire in violation of *Irvin v. Dowd*, supra. Upon a review of the voir dire examination of prospective jurors in that case, the Supreme Court did hold that the trial court's finding of juror impartiality "does not meet constitutional standards." 366 U. S. at p. 728. However, citing from Chief Justice Hughes' observations in *United States v. Wood*, 299 U. S. 123, 145-146 (57 SC 177, 81 LE 78) (1936), the Court in *Irvin v. Dowd*, supra, stated, " 'Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.' " 366 U. S. at pp. 724-725. As to Joyce Adams, the trial court merely prohibited defense counsel from asking her repetitive questions.

(E) Finally, appellants complain of the trial court's refusal to divulge the reasons for excusing some prospective jurors who gave an affirmative response to the statutory voir dire question as to whether they had formed and expressed any opinion in regard to the guilt or

innocence of the accused. Appellants also complain that they were not allowed to establish prejudice against the defendants on the part of some of these prospective jurors who were excused for reasons other than cause, and they complain of the large number of veniremen who expressed a preexisting opinion as to the outcome of the case and who were subsequently qualified as jurors. Again, however, these arguments are not supported by citations to the transcript. We, therefore, find them to be without merit.

4. In Jordan's and Cagle's fifth enumeration of error, they have constructed a multi-faceted challenge to the constitutionality of RICO, arguing that it violates constitutional requirements of due process and equal protection as well as the constitutional prohibition against the enactment of ex post facto laws.

(A) Appellants contend that OCGA § 16-14-3 (1) is overbroad in defining "enterprise" as including "illicit as well as licit enterprises." This argument ignores *United States v. Turkette*, supra, wherein the United States Supreme Court held that even though the federal RICO statute does not unambiguously, on its face define enterprises to include those that are illegitimate as well as legitimate, it should be so interpreted.

(B) Appellants seek to distinguish this case from cases such as *United States v. Elliott*, 571 F2d 880, supra, on the ground that in cases such as *Elliott* the RICO statute had ingrained upon it the concepts of intent and scienter. Here, the trial court charged the jury that the state was required to prove that appellants' participation in the enterprise through a pattern of racketeering activity was knowing and voluntary. Thus, the concepts of intent and scienter were ingrained upon the statute through the trial court's instructions to the jury here.

(C) The appellants also argue that OCGA § 16-14-3 (2) is vague and overbroad in defining "pattern of racketeering" as "at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents . . ."

As previously stated, the quoted statutory language serves to limit the definition of that term, rather than rendering the "pattern" definition vague and overbroad.

(D) In addition, appellants attack OCGA § 16-14-4 (b) on grounds of vagueness and overbreadth. As previously stated, § 16-14-4 (b) provides, "It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." The appellants contend that this statutory provision is vague and overbroad in that it makes it unlawful to "associate" or "participate" even "indi-

rectly" in an enterprise. However, appellants fail to state that such participation in the enterprise be "through a pattern of racketeering activity." In any event, appellants contend that this statutory language does not put a person of ordinary intelligence on notice that he or she is committing a crime. See generally *Bell v. State*, 252 Ga. 267 (313 SE2d 678) (1984); *Sabel v. State*, 250 Ga. 640 (300 SE2d 663) (1983).

As stated earlier, this provision of the Georgia RICO statute is substantially the same as the comparable provision of the federal RICO statute, and similar vagueness challenges to the federal statute have repeatedly failed. "In its classic formulation of the standard for establishing unconstitutional vagueness, the Supreme Court held that a penal statute 'must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.' If 'men of common intelligence' must guess at the meaning of a statute, the statute violates due process of law. *Connally v. General Construction Co.*, 269 U. S. 385, 391 (46 SC 126, 127, 70 LE 322, 328) (1926). See also *Palmer v. Euclid*, 402 U. S. 544 (91 SC 1563, 29 LE2d 98) (1971); *United States v. National Dairy Products Corp.*, 372 U. S. 29 (83 SC 594, 9 LE2d 561) (1963); *Cramp v. Board of Public Instruction*, 368 U. S. 278 (82 SC 275, 7 LE2d 285) (1961); *United States v. Harriss*, 347 U. S. 612 (74 SC 808, 98 LE2d 989) (1954). By this standard, quoting from § 1962 (c), we hold that 'any person' of average intelligence, on a clear reading of that statute, together with relevant definitional provisions, could not help but realize that they would be criminally liable for participating in 'any enterprise,' including their own, 'through a pattern of racketeering activity.'" *United States v. Hawes*, 529 F2d 472, 479 (5th Cir. 1976); e.g., *United States v. Morelli*, 643 F2d 402, 412 (6th Cir. 1981).

(E) Appellants also argue that OCGA § 16-14-6 (5) (e) violates equal protection in providing that a defendant is estopped in a subsequent civil action as to all matters proved in the criminal proceeding. However, since this is not a civil RICO proceeding, the question as to the constitutionality of this provision is not justiciable herein. See *State v. Raybon*, 242 Ga. 858, 862 (252 SE2d 417) (1979) and cits.

(F) The appellants' argument that the RICO statute violates the constitutional prohibition against ex post facto laws, is based on the fact that two predicate crimes must be committed in order for there to be established a "pattern of racketeering," and only one of these predicate acts must occur after the effective date of the statute, i.e., July 1, 1980.

However, it has been held repeatedly that this same feature of the federal statute, requiring that at least one predicate act take place after the effective date of the statute, saves the statute from running afoul of the Ex Post Facto Clause. *United States v. Brown*, 555 F2d

407 (7) (5th Cir. 1977); *United States v. Champanale*, 518 F2d 352 (9th Cir. 1975).

5. In each appellant's sixth enumeration of error, they argue that the trial court erred in denying their motion for change of venue.

"In *Street v. State*, 237 Ga. 307, 311 (227 SE2d 750) (1976), we concluded regarding motions for change of venue 'that under the decisions of the Supreme Court of the United States, to find that the petitioner did not receive a fair trial, petitioner must show (1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible.' The second test involves review of the voir dire examination of potential jurors. See *Mooney v. State*, 243 Ga. 373, 387-388 (254 SE2d 337) (1979) . . . However, the empanelling of fair and impartial jurors, as demonstrated on voir dire, makes it particularly difficult to show that the setting of the trial was inherently prejudicial. See *Potts v. State*, 241 Ga. 67 (8) (243 SE2d 510) (1978). Nevertheless we turn to that aspect of *Street v. State*, supra.

"Traditionally, a defendant seeking a change of venue on the basis that the setting of the trial is inherently prejudicial relies heavily if not primarily or exclusively on news media reports, particularly newspapers (because they are easier to collect). However, widespread or even adverse publicity is not in itself grounds for a change of venue. *United States v. McNally*, 485 F2d 398, 403 (8th Cir. 1973), cert. denied 415 U. S. 978 (1974); *Mooney v. State*, supra, 243 Ga. 373, 387. On appeal, the impact of media publicity is evaluated by various factors, such as the size of the community and the extent of media coverage (number of articles and their circulation); whether it related to the discovery of the crime (e.g., facts regarding the victim) or to the apprehension or interrogation of the defendant (and whether any publicized confession was admitted at trial); the prominence and content of the reports (e.g., facts vs. speculation and emotionalism, and the accuracy and admission into evidence of those facts); and the time interval between the publicity and the trial. *Stroble v. California*, 343 U. S. 181, 191-195 (72 SC 599, 96 LE 872) (1952); *Mooney v. State*, supra, 243 Ga. at 385-387; *Brooks v. State*, 244 Ga. 574, 578-581 (261 SE2d 379) (1979). Although some of these considerations cannot be resolved until the evidence is closed, on appellate review the impact of the pretrial publicity of evidence and the admission of evidence can be compared. See *Stroble v. California*, supra, 343 U. S. at 195." *Kesler v. State*, 249 Ga. 462, 471-472 (7) (291 SE2d 497) (1982).

This court has held that "[t]he test as to whether newspaper publicity has so prejudiced a case that an accused cannot receive a fair trial is whether the jurors summoned to try the case have formed fixed opinions as to guilt or innocence of the accused from reading

such newspaper articles." *Welch v. State*, 237 Ga. 665, 668 (229 SE2d 390) (1976). "The decision to grant a change of venue lies within the discretion of the trial court, and its discretion will not be disturbed absent an abuse of that discretion. *Allen v. State*, 235 Ga. 709, 713 (221 SE2d 405) (1975); *Jarrell v. State*, 234 Ga. 410, 415 (216 SE2d 258) (1975)." *Patterson v. State*, 239 Ga. 409, 418 (5) (238 SE2d 2) (1977).

(A) Was the setting of the trial inherently prejudicial as a result of the pretrial publicity?

From our review of the record, we cannot say that the trial court abused its discretion in ruling that the pretrial publicity in this case was not so inflammatory as to render the setting of the trial inherently prejudicial.

This trial was held in Walton County, the population of which is approximately 32,000. Voir dire examination began on February 28, 1983. Appellants' evidence does show that, from October 1, 1982, until the date of the trial, there was extensive newspaper coverage, i.e., some 73 newspaper articles, concerning this case. The articles submitted in evidence appeared in the Walton County Tribune, the Athens Banner-Herald and the Athens Daily News, and the Atlanta Constitution and Atlanta Journal. Many front-page articles appeared in the Walton County paper. The evidence shows that the Walton County paper has a circulation of approximately 5,100, but there has been no showing as to the circulation of these other papers in the county. However, it was established that only a handful of prospective jurors had read the other papers.

The newspaper articles primarily concerned the facts relating to the RICO charges against the appellants. The content of the articles could not be described as emotionalistic, and there was certainly nothing comparable to the type of emotionalism seen in *Coleman v. Kemp*, 778 F2d 1487 (11th Cir. 1985). There were statements in some of these articles in regard to Harold Chancey's being the "king pin" of the "Dixie Mafia," and there was pretrial publicity and community knowledge concerning the Dixie Mafia's murder of a witness in another case. However, the predominant content of these articles consisted of facts which were established by evidence admitted at trial.

In any event, "the record of publicity in the months preceding, and at the time of, the . . . trial does not reveal the 'barrage of inflammatory publicity immediately prior to trial,' *Murphy v. Florida*, 421 U. S. 794, 798 (1975), amounting to a 'huge . . . wave of public passion,' *Irvin [v. Dowd*, 366 U. S., supra, p. 728], that the court found in *Irvin*." *Patton v. Yount*, 467 U. S. 1025, 1032-1033 (104 SC 2885, 81 LE2d 847) (1984). "[T]here is no evidence of a 'total inundation of the judicial process by the media' at this trial. *Sheppard v. Maxwell*, 384 U. S. 333 (86 SC 1507, 16 LE2d 600) (1966); *Estes v. Texas*, 381

U. S. 532 (85 SC 1628, 14 LE2d 543) (1965); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980)." *Berryhill v. State*, 249 Ga. 442, 443 (2) (291 SE2d 685) (1982). We cannot say that the setting of the trial was inherently prejudicial as a result of pretrial publicity.

(B) Was the setting of the trial inherently prejudicial as a result of the widespread community fear and bias alleged by the appellants?

To answer this question in the affirmative would be to hold that appellants were entitled to a change of venue without the trial court's even summoning prospective jurors to court and examining them in order to determine whether those prospective jurors actually summoned could in fact serve as fair and impartial jurors in the case. Thus, in determining whether community bias rendered the trial setting inherently prejudicial, as in determining whether pretrial publicity rendered the setting of the trial inherently prejudicial, we hold that questions should be asked as to whether the trial was held in an inflammatory atmosphere and whether there was a "wave of public passion." *Berryhill v. State*, 249 Ga. at p. 443, citing from *Irvin v. Dowd*. If factors such as these do not exist, the question of whether the criminal defendant is able to obtain a fair trial in a particular case should be determined through the jury selection process.

We hold that, based on the present record, the trial court cannot be said to have abused its discretion or erred in ruling that there has been no such showing here of an inherently prejudicial trial setting as a result of community fear and bias.

(C) Did the jury selection process show actual prejudice to a degree that rendered a fair trial impossible?

In resolving an argument such as this, as in resolving the "small-town syndrome" argument, in our opinion "the proper test is whether the prospective juror 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' *Irvin v. Dowd*, 366 U. S. 717, [supra, 723]; *Young v. State*, [239 Ga. 53 (236 SE2d 1) (1977)]." *Berryhill v. State*, supra, 249 Ga. at pp. 443-444.

From our review, it appears that in this case 222 prospective jurors were questioned on voir dire examination. Of these, 94 (42.3%) were excused for cause on the ground that they had formed fixed opinions which they could not set aside and render a verdict based solely on the evidence presented at trial. 69 prospective jurors (31.1%) were ruled to be qualified for service on the panel from which the jury was selected. 56 prospective jurors (25.2%) were excused for reasons other than cause, i.e., children, age, health. 4 (.02%) were qualified but later excused, and 1 (.5%) was excused both for cause and for other reasons. The appellants state that 160 prospective jurors (72.1%) had heard or read about the case, and 134 prospective jurors (60.4%) expressed an opinion about the case. See OCGA § 15-12-164 (a) (1).

Again, the question is not the number of jurors who had heard about the case; rather, the question is whether those jurors who had heard about the case could lay aside their opinions and render a verdict based on the evidence. See *Mooney v. State*, 243 Ga., supra, p. 388; *Berryhill v. State*, supra. Upon reviewing the transcript, particularly those portions of the transcript cited to by appellants in their briefs, we cannot say that the trial court abused its discretion in qualifying those veniremen who did ultimately testify that they could lay aside their opinions and render a verdict based on the evidence.

It is not necessary to decide whether or not the percentage of the venire excused for prejudice was sufficiently low to corroborate the credibility of expressions of impartiality by those veniremen who were not excused for prejudice. All it is necessary to hold is that the fact that approximately 40% of the venire was excused for cause due to prejudice against appellants, did not demand a finding that the jury selection process showed actual prejudice to a degree that rendered a trial fundamentally unfair. See *Patton v. Yount*, supra; *Butler v. State*, 231 Ga. 276 (2) (201 SE2d 448) (1973).

6. In his first enumeration of error, appellant Chancey argues that the state did not prove venue.

As previously stated, the venue provision in the Georgia RICO statute states that in any criminal RICO proceeding "the crime shall be considered to have been committed in any county in which an incident of racketeering occurred or in which an interest or control of an enterprise or real or personal property is acquired or maintained." OCGA § 16-14-11.

In this enumeration, Chancey points out that the pattern of racketeering activity and the existence of the enterprise are separate elements. *United States v. Ruggiero*, 754 F2d 927 (11th Cir. 1985). He further points out that under our state Constitution, all criminal cases generally must be tried "in the county where the crime was committed." Article VI, Section II, Paragraph VI of the Georgia Constitution of 1983. Chancey proceeds to argue that the RICO statute's venue provision violates Georgia's constitutional provision on venue in criminal cases in that RICO does not require that at least two predicate crimes be committed in the county in which the criminal proceeding is being brought. Consequently, Chancey argues that, as a result of this, the evidence is insufficient to support his RICO conviction.

By analogy, the cases exemplified by *Caldwell v. State*, 142 Ga. App. 831, 832-833 (2) (237 SE2d 452) (1977), control Chancey's argument adversely to him. In *Caldwell*, it was held that "[t]he facts of this case do not require a reversal under the law enunciated in *Jones v. State*, 135 Ga. App. 893, 901 (219 SE2d 585) holding: 'Where overt acts are alleged to have been committed in more than one jurisdiction, it is essential to a conspiracy prosecution that the jury be prop-

erly instructed as to venue.' In Georgia, both the corrupt agreement and an overt act must be proved; *venue may be laid in the county of either, or, if there are several overt acts, in a county where any of them was committed. Finley v. United States*, 271 F2d 777." (Emphasis supplied.) 142 Ga. App. at pp. 832-833.

Furthermore, if Chancey were correct in his argument, venue as to a § 16-14-4 (b) charge would lie nowhere if each predicate crime had been committed in a different county. And, as we have previously stated, Chancey's RICO conviction also rests on his guilty verdict under § 16-14-4 (a) for maintenance of property interests derived through the pattern of racketeering activity as well as the proceeds derived therefrom, and Chancey does not contest the establishment of venue in Walton County thereunder.

7. In Chancey's second enumeration of error, he argues that the indictment is multiplicitous.

"Multiplicity is the charging of the same crime in several counts of a charging document. *Bell v. United States*, 349 U. S. 81 (75 SC 620, 99 LE 905) (1955)." *United States v. Rosenthal*, 793 F2d 1214, 1234 (32) (11th Cir. 1986).

Here, Count 1 of the indictment charged appellants with violating RICO. Counts 2 through 5 charged appellant Chancey, and others, with murder and arson, and these latter counts were based on different facts from those supporting the RICO count. We find that the indictment was not multiplicitous.

8. In Jordan's and Cagle's seventh enumeration of error, they both contend that the trial court erred in denying their motions for trial severance.

"The relevant American Bar Association Minimum Standards relating to joinder and severance provide that the court should grant a severance before or during the trial whenever it appears 'necessary to achieve a fair determination of the guilt or innocence of a defendant.' ABA Standards, § 2.3 (b). It is thus evident that the trial judge must exercise his discretion in contemplation of the facts of each particular case. *Tillman v. United States*, 406 F2d 930 (5th Cir. 1969). But the burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. *Tillman v. United States*, supra. He must make a clear showing of prejudice and a consequent denial of due process. *Smith v. United States*, 385 F2d 34 (5th Cir. 1967); *Milam v. United States*, 322 F2d 104 (5th Cir. 1963), cert. denied, 377 U. S. 911 (1964).

"Some of the considerations for the court in exercising its discretion have emerged from the cases considering motions to sever: 1. Will the number of defendants create confusion of the evidence and law applicable to each individual defendant? 2. Is there a danger that evidence admissible against one defendant will be considered against

another despite the admonitory precaution of the court? 3. Are the defenses of the defendants antagonistic to each other or to each other's rights? See, *People v. Maestas*, 517 P2d 461 (Colo. 1973). If the defendant can show the court by some facts that failure to sever will prejudice him under one or more of these considerations, his motion should probably be granted." *Cain v. State*, 235 Ga. 128, 129 (218 SE2d 856) (1975).

Here, as previously stated, all three appellants were charged with violating RICO; appellant Chancey, Ruth Chancey, and Bobby Gene Goswick were charged with separate crimes of murder and arson. However, Ruth Chancey's motion for severance was granted, and the trial judge subsequently declared a mistrial on the murder-arson charges.

Although different predicate crimes were charged against each appellant in the RICO count of the indictment, the potential for confusion of evidence was minimized by the trial judge's providing the jurors with copies of the indictment and requiring them to specify in their verdict the predicate crimes of which each appellant was found guilty. There was no confusion of law, and the appellants did not assert antagonistic defenses. To the extent that there was evidence admissible against one of the defendants and not admissible against the other defendants, there has been no showing of prejudice requiring the grant of a trial severance.

9. In Jordan's and Cagle's fourth enumeration of error, they complain of prejudice caused by excessive and conspicuous security measures taken by the trial court.

"Although a defendant is entitled to trial free of the partiality which the presence of an excessive number of guards may create, special circumstances may make the presence of a number of guards necessary. *Green v. State*, 246 Ga. 598 (272 SE2d 475) (1980); *Allen v. State*, 235 Ga. 709 (221 SE2d 405) (1975). We find the security measures taken to be reasonable and appropriate. In making this finding, we considered the nature of the crimes for which petitioner was convicted and the surrounding circumstances. See also *Birt v. Hopper*, 245 Ga. 221 (265 SE2d 276) (1980)." *Zant v. Gaddis*, 247 Ga. 717, 718 (2) (279 SE2d 219) (1981). "As to the question of guards in the courtroom, it is well established that the trial court may in its discretion take the measures it deems reasonably necessary to insure that the courtroom is secure and conducive to the conduct of a fair and safe trial. See *Green v. State*, [supra]." *Welch v. State*, 251 Ga. 197, 201 (7) (304 SE2d 391) (1983).

Appellants' main complaint is that law enforcement security in and around the Walton County Courthouse before and during the trial was so prominent and extensive that it gave the courthouse a fortress-like atmosphere, which contributed to the community bias

and prejudice against the appellants. However, appellants have failed to establish on the record that the security measures adopted by the trial court were unreasonable. In the words of *Holbrook v. Flynn*, 475 U. S. ___ (106 SC 1340, 1348, 89 LE2d 525) (1986), the appellants have not shown that the "challenged practice" "was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial."

10. In Jordan's and Cagle's ninth and tenth enumerations of error, they argue that the trial court erred in refusing to grant their motions for mistrial as a result of various instances of prosecutorial misconduct.

However, the only specific instance of prosecutorial misconduct of which appellants complain is the statement made by the prosecuting attorney in opening argument. In this statement, the prosecuting attorney informed the jury that he would not know what appellants' defense would be "until they get up and tell you, if they want to, and they are not required to, or until they put up witnesses, if they want to, and they are not required to, I have no way of knowing what they are going to show . . ." Upon objection by defense counsel, the trial court admonished the prosecuting attorney to limit his opening statement to what he expected the state to prove. And, the court gave curative instructions to the jury with respect to the rule that there is no burden on the defense to prove or disprove anything, as well as the rule that no inference of guilt is to be drawn against the defendant because of his failure to present evidence.

"In passing on a motion for mistrial because of an improper statement of a prosecutor, the trial judge may take such action as in his judgment will prevent harm to the defendant, and a new trial will not be granted unless it is clear that such action failed to eliminate the statement from consideration by the jury. *Bradley v. State*, 234 Ga. 664, 668 (217 SE2d 264) (1975); *Howard v. State*, 229 Ga. 839, 840 (195 SE2d 14) (1972); *Moore v. State*, 228 Ga. 662, 664 (187 SE2d 277) (1972). In this case, we believe the trial judge's instruction to the jury was sufficient to protect appellant[s] from the prejudicial effect of the prosecutor's [opening] remarks. Therefore, we hold the trial judge did not abuse his discretion in denying the motion for mistrial. See *Ford v. State*, 232 Ga. 511, 518 (207 SE2d 494) (1974); and *Woods v. State*, 233 Ga. 495, 498 (212 SE2d 322) (1975)." *Watkins v. State*, 237 Ga. 678, 682-683 (229 SE2d 465) (1976).

11. In Jordan's eleventh enumeration of error, he argues that the trial court erred in allowing the court reporter an unlimited time in which to prepare the trial transcript.

Where the appealing party is the defendant in a felony case, and where the defendant states in his notice of appeal that a transcript is to be transmitted as part of the appellate record, it is the defendant's

statutorily mandated duty to cause the court reporter to prepare and file an original and one copy of the transcript with the clerk of the trial court within 30 days after the filing of the notice of appeal unless an extension of time is obtained. *State v. Hart*, 246 Ga. 212 (271 SE2d 133) (1980). Here, appellant Jordan obtained an indefinite extension of time for the filing of the transcript, and the transcript was not prepared by the court reporter until approximately three years and four months after completion of the trial. Unfortunately, there is no statute in Georgia requiring that the court reporter deliver the transcript within a given time limit.

*Rheuark v. Shaw*, 628 F2d 297, 302 (5th Cir. 1980), holds that "due process can be denied by any substantial retardation of the appellate process, including an excessive delay in the furnishing of a transcription of testimony necessary for completion of an appellate record. [Cits.]" The court in *Rheuark* went on to hold that the four-factor test set out in *Barker v. Wingo*, 407 U. S. 514, 530 (92 SC 2182, 33 LE2d 101) (1972) (i.e., the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant) is "appealing as means to determine whether a denial of due process has been occasioned in any given case." 628 F2d at p. 303.

Here, the appellant avers that the probability of error in transcription increases with the lengthening of the time span between the take-down and transcribing of the testimony. And, appellant does point to a number of errors and omissions which were found in the transcript originally prepared by the court reporter. However, at least most of these errors were presumably corrected, and, in a letter to the trial judge, appellant even stated that he "tended to agree with the state's position that under the circumstances the transcript is probably as correct as humanly possible." Although appellant argues that the dependability of the transcript is still in doubt, he has not shown any errors of such magnitude as to result in his being prejudiced in the prosecution of his appeal. We find this enumeration of error to be without merit.

12. In his twelfth enumeration of error, appellant Jordan argues that the trial court erred in compelling his former wife, Diana Jordan, to testify against him. He argues that her testimony was not compellable, in that OCGA § 24-9-21 (1) creates an evidentiary privilege under which communications between husband and wife are excluded from evidence on grounds of public policy.

Appellant cites such cases as *Bishop v. Bishop*, 124 Ga. 293 (2) (52 SE 743) (1905), as authority for the general proposition that neither a husband nor a wife is competent to give any evidence in any criminal proceeding for or against the other. However, this argument ignores the fact that OCGA § 24-9-21 (1) has been modified by OCGA § 24-9-23, which provides that a spouse shall be competent, although

not compellable, to testify against the other spouse. *Hubbard v. State*, 145 Ga. App. 714 (1b) (244 SE2d 639) (1978). This testimonial privilege belongs to the witness and not the accused. E.g., *Stanley v. State*, 240 Ga. 341 (6) (241 SE2d 173) (1977). In any event, where the knowledge of the facts as to which the spouse is testifying was not acquired by such spouse as a result of any special confidence reposed in that spouse by the other spouse in reliance on the marital relationship, the communication is not confidential. *Wilcox v. State*, 250 Ga. 745 (3) (301 SE2d 251) (1983) and cits. Thus, where one spouse is testifying as to what was said by the other spouse in the presence of a third person, the communication is not privileged. *R. & J. Dick Co. v. Walter C. Bass & Belting, Inc.*, 295 FSupp. 758 (N.D. Ga. 1968).

Thus, appellant Jordan is incorrect in his argument that Diana Jordan was incompetent to testify against him. It is true that in this case, Diana Jordan was an unindicted co-conspirator, and she testified under a grant of immunity for her testimony. However, "[t]he grant of immunity does not operate to compel one spouse to testify against another. *State v. Smith*, 237 Ga. 647 (229 SE2d 433) (1976)." *Stanley v. State*, supra, 240 Ga. at p. 348. And, in this enumeration of error, appellant does not complain of the admission of any specific testimony as being privileged and, therefore, not compellable. Accordingly, we find this enumeration of error to be without merit.

13. In his thirteenth enumeration of error, appellant Jordan argues that the trial court erred in refusing to give his request to charge, in accordance with *United States v. Tramunti*, 513 F2d 1087, 1107 (2nd Cir. 1975), that if the jury found that a particular defendant was a member of another enterprise, not the one charged in the indictment, then the jury must acquit that defendant.

This charge was not adjusted to the evidence, in that there was no evidence admitted which supported the existence of another enterprise of which Jordan might have been a member. In addition, Jordan waived his right to object to this charge, because, when he was asked by the trial judge at the conclusion of the instructions to the jury whether he had any objections thereto, in none of his objections did he preserve his right to complain on appeal of this charge. See *DeVoe v. State*, 249 Ga. 499 (292 SE2d 72) (1982) and cits.

*Judgment affirmed. All the Justices concur.*

Decided November 13, 1986.

*Johnson, Turner & Henritze, Walter M. Henritze, Jr.*, for appellants.

*John M. Ott, District Attorney, John T. Strauss, Assistant District Attorney, Michael J. Bowers, Attorney General, George P.*

*Shingler, Assistant Attorney General, Charles C. Olson, Special Assistant Attorney General,* for appellee.