S97P1166, S97P1207. RAULERSON v. THE STATE.
(491 SE2d 791)

BENHAM, Chief Justice.

Appellant Billy Daniel Raulerson received three death sentences for the malice murders of teenagers Jason Hampton and Charlye Dixon and the felony murder of Gail Taylor. Raulerson was also convicted of burglary, kidnapping, necrophilia, and possession of a firearm during the commission of a crime and possession of a firearm during the commission of a felony.*

On May 31, 1993, the bodies of Jason Hampton, Charlye Dixon, and Gail Taylor were found in separate locations in Ware County. Each victim had been shot multiple times by a .22 caliber rifle, and Ms. Taylor suffered a potentially fatal knife wound to her wrist. Semen and spermatozoa were found in Ms. Dixon's rectum. Seven months later, appellant was arrested on unrelated aggravated assault and weapons charges and gave police a blood sample. Analysis of the DNA from the blood sample and from the semen recovered from Ms. Dixon led an expert to conclude that both samples of body fluid originated from the same person. After receiving the DNA test results, law enforcement officers questioned appellant about the

---

[1] 267 Ga. 683, 699-700 (482 SE2d 347) (1997).

* The crimes occurred on May 30-31, 1993. Raulerson was indicted by the Ware County grand jury on February 2, 1994 for two counts of malice murder, burglary, felony murder, kidnapping, aggravated sodomy, necrophilia, two counts of possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. The State filed its notice of intent to seek the death penalty on April 1, 1994. Pursuant to a change of venue, Raulerson was tried before a jury in Chatham County from February 20 to March 7, 1996. The jury returned a not guilty verdict on the aggravated sodomy charge, and guilty verdicts on eight of the nine remaining counts. The State nol prossed the convicted felon possession charge. Raulerson was sentenced on March 15, 1996, and filed both a motion for new trial and a notice of appeal on April 1, 1996. The motion for new trial was amended on January 17, 1997, and denied on March 12, 1997. Raulerson filed a second notice of appeal on April 11, 1997. His case was docketed in this Court on April 21, 1997 and orally argued on September 16, 1997.

three murders, and he admitted killing the three victims. When officers executed a search warrant at appellant's residence, they found a fishing rod and reel identified as having been taken from Hampton's pickup truck the night he was killed, and parts of a .22 caliber rifle. A ballistics expert testified that the shell casings found near Hampton's body and in Ms. Taylor's home were probably fired from the rifle found in appellant's home.

In statements to investigating officers after the DNA test results were known, appellant admitted parking his car the evening of May 30, 1993, at a Ware County lakeside "lovers' lane" near the pickup truck occupied by Hampton and Dixon. Appellant stated that he stood on the bed of the pickup truck and shot Hampton several times, and then shot Dixon as she attempted to flee. Appellant dragged Hampton's body from the truck and shot him several more times; he then put Dixon and two fishing rods from the pickup truck in his vehicle and drove to a wooded area several miles away where he shot Dixon again and sodomized her. His attempt to return to Dixon's body the next day was thwarted by the presence of people at the site, so he drove to a rural section of the county looking for a house to burglarize. He stopped at a home with no vehicle in the carport and, when no one responded to his knock at the door, Raulerson broke into a utility shed and stole meat from the freezer. As he was loading the meat into his car, he heard someone inside the house. He entered the home, struggled with Gail Taylor who was armed with a kitchen knife, and shot her multiple times. He then stole Taylor's purse. Appellant told the officers interviewing him that he had stolen the .22 caliber rifle from a Pierce County residence he had burglarized three weeks before the shootings.

In response to expert testimony presented by appellant that tests administered after the crimes established that appellant was mentally retarded with an IQ of 69, the State presented expert testimony appellant's IQ at age 15 (9 years earlier) was 83. The State's psychologist opined that there was no indication that appellant was severely mentally ill.

1. The evidence summarized above was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of two malice murders and felony murder, burglary, necrophilia, and possession of a firearm during the commission of a crime and during the commission of a felony. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). With regard to the evidence of the charge that appellant kidnapped Ms. Dixon, appellant contends that the trial court erred in denying his motion for directed verdict of acquittal because the State failed to prove the victim was alive when appellant transported her body from the lakeside shooting site to the area where her body was found.

A directed verdict of acquittal is appropriate when "there is no conflict in the evidence and the evidence introduced with all reasonable deductions and inferences therefrom shall demand a verdict of acquittal or 'not guilty'. . . ." OCGA § 17-9-1 (a). In the case at bar, the forensic pathologist who examined Ms. Dixon's body testified that there was nothing which indicated that any of the seven gunshot wounds inflicted upon the victim were inflicted after her death. In his statement to law enforcement officers, appellant said he had shot the victim again after he had transported her from the lovers' lane and before he sexually assaulted her. A reasonable deduction or inference from the pathologist's testimony and appellant's chronicling of events is that the victim was still alive when appellant last shot her, after he took her from the lovers' lane and before he sexually assaulted her. A verdict of acquittal not being demanded by the evidence and the deductions and inferences drawn therefrom, it was not error for the trial court to deny appellant's motion for directed verdict.

2. Raulerson contends that the trial court erred in denying his motion to suppress the DNA blood and semen comparison evidence, his incriminating statements, and the evidence seized from his residence pursuant to a search warrant.

(a) Appellant first contends that the investigating officers obtained the blood sample from him by means of a warrantless, unreasonable search and seizure. Acknowledging that appellant signed a waiver of the search warrant required to take a blood sample, appellant argues that the State failed to prove that his consent to the search and seizure of his blood was freely and voluntarily given.

In order to justify a warrantless search on the grounds of consent, the State has the burden of proving that the consent was freely and voluntarily given under the totality of the circumstances. *Dean v. State*, 250 Ga. 77 (2) (a) (295 SE2d 306) (1982). See *Schneckloth v. Bustamonte*, 412 U. S. 218, 229 (93 SC 2041, 36 LE2d 854) (1973). See also *State v. Davis*, 261 Ga. 225, 226 (404 SE2d 100) (1991). Relevant factors include the age of the accused (twenty-four), his education (eighth grade education and literate), his intelligence, the length of detention (twenty-four hours), the fact that appellant was advised of his constitutional rights, that the questioning which produced the consent was not of a prolonged nature, that no physical punishment was used to procure the consent, and the psychological impact of these factors on the accused. *Dean,* supra at 80. No one factor is controlling. Id.

Raulerson argues that he was incapable of giving voluntary consent because he is mentally retarded and his limited reading skills precluded him from making a knowing waiver of his right to a search

warrant. The strict standard of waiver applied to Fifth Amendment claims does not extend to the protections of the Fourth Amendment, and a suspect's intelligence is only one factor in determining whether consent was voluntary. *Schneckloth v. Bustamonte,* supra, 412 U. S. at 246. *Dean v. State,* supra, 250 Ga. at 80. There was no evidence presented at the suppression hearing to the effect that Raulerson was mentally retarded, and the evidence presented did not support Raulerson's claim that he lacked the capacity to consent.

Appellant next argues that even if given, his consent was invalid because it was obtained when officers continued to interrogate him after he repeatedly invoked his right to counsel. *Edwards v. Arizona,* 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981) (a defendant who invokes his Fifth Amendment right to counsel during custodial interrogation may not be subjected to further interrogation until counsel is made available to him unless he subsequently initiates communication). Even if we assume that blood evidence which is neither testimonial nor communicative in nature is protected by *Miranda v. Arizona,* 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), the officers who interviewed Raulerson and the lab technician who drew the blood sample all testified at the suppression hearing that Raulerson never asked for an attorney. Furthermore, prior to giving his consent, Raulerson executed a signed waiver of counsel. The trial court's conclusion that appellant did not invoke his right to counsel is supported by the evidence and is not clearly erroneous. Therefore, we uphold it. *Johnson v. State,* 266 Ga. 140 (2) (464 SE2d 806) (1996). In conclusion, we note that the evidence presented at the suppression hearing failed to demonstrate that Raulerson was incapable of giving consent or that his will was overborne. Under the totality of the circumstances, the trial court's determination that Raulerson freely and voluntarily consented to the drawing of the blood sample is not clearly erroneous. *Dean v. State,* supra, 250 Ga. at 79-80.

(b) Appellant next takes issue with the trial court's failure to suppress appellant's incriminating statements made while in custody. After conducting a hearing pursuant to *Jackson v. Denno,* 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), the trial court determined that Raulerson's custodial statements were freely and voluntarily given after he had made a knowing and intelligent waiver of his rights under *Miranda.* The trial court's factual and credibility findings following a *Jackson v. Denno* hearing must be accepted by the reviewing court unless clearly erroneous. *Bright v. State,* 265 Ga. 265 (5) (b) (455 SE2d 37) (1995).

Raulerson contends that his waiver of counsel was unknowing because he is mentally retarded. Whether an accused is capable of making a knowing and intelligent waiver of rights is a question to be resolved in the trial court and the trial court's finding will be

accepted on appeal unless clearly erroneous. See *Williams v. State*, 267 Ga. 771 (482 SE2d 288) (1997). Raulerson presented no evidence of mental retardation at the *Jackson v. Denno* hearing, and the jury was authorized to find that his expert's testimony on this point at trial was effectively rebutted by the State.[2] See, e.g., *Stripling v. State*, 261 Ga. 1 (3) (a) (401 SE2d 500) (1991). Raulerson's reading ability, even if limited, did not render his confession inadmissible. See *Williams v. State*, 238 Ga. 298 (1) (232 SE2d 535) (1977). Furthermore, several waiver forms had been read to and signed by Raulerson. The trial court's determination that Raulerson knowingly waived his rights was not rendered clearly erroneous by the fact that he was shown at trial to have below normal intelligence. *White v. State*, 266 Ga. 134 (2) (465 SE2d 277) (1996); *Lawton v. State*, 263 Ga. 168 (2) (429 SE2d 921) (1993).

Raulerson argues that his confession was the product of intimidation because one of the interrogating officers purportedly became angry during the interview and brushed his jacket back, revealing his gun to Raulerson. A confession must be suppressed if induced "by the slightest hope of benefit or remotest fear of injury." OCGA § 24-3-50; *Lewis v. State*, 255 Ga. 681 (3) (341 SE2d 434) (1986). The only evidence of intimidating behavior on the part of the officers is Raulerson's testimony to that effect, and the trial court's decision against appellant's position is the result of a credibility determination which is not clearly erroneous.

Raulerson next argues that his confession is inadmissible because he was questioned in violation of his Sixth Amendment right to counsel under *Massiah v. United States*, 377 U. S. 201 (84 SC 1199, 12 LE2d 246) (1964). *Massiah* holds that the Sixth Amendment prohibits questioning a defendant in the absence of counsel about an offense in which the defendant is known to be represented by counsel " 'at or after the initiation of adversary judicial proceedings against the defendant.' " *Ross v. State*, 254 Ga. 22 (3) (b) (326 SE2d 194) (1985). See *Brewer v. Williams*, 430 U. S. 387, 398 (97 SC 1232, 51 LE2d 424) (1977). The record is clear that Raulerson was arrested and appointed counsel on the murder charges *after* he confessed.[3]

---

[2] Under our statute, the essential features of mental retardation are (i) significantly subaverage general intellectual functioning, (ii) resulting in or associated with impairments in adaptive behavior, and (iii) manifestation of this impairment during the developmental period. OCGA § 17-7-131 (a) (3). "Subaverage general intellectual functioning" is generally defined as an IQ of 70 or below. OCGA § 17-7-131 (a) (3); *Stripling v. State*, supra, 261 Ga. at 4. The State presented expert testimony which showed Raulerson attained an IQ score of 83 on a test administered at age 15.

[3] Raulerson argues that his Sixth Amendment right to counsel was violated because at the time of the questioning, he was represented by counsel on unrelated charges. Since Raulerson's Sixth Amendment right to counsel had not come into play because criminal proceedings had not been instituted against him, we need not reach this question; however, we

Since counsel was appointed prior to commencement of criminal proceedings, there was no violation of Raulerson's Sixth Amendment rights. *Davis v. United States*, 512 U. S. 442 (114 SC 2350, 129 LE2d 362) (1994); *State v. Hatcher*, 264 Ga. 556, 558 (448 SE2d 698) (1994).

Raulerson argues that an affidavit of indigence form should be construed as invocation of his Fifth Amendment right to counsel because he is mentally retarded. Under the Fifth Amendment, a suspect who invokes his right to counsel is entitled to the assistance of counsel during custodial interrogation, and authorities must immediately cease questioning when a suspect invokes that right. *Edwards v. Arizona*, supra, 451 U. S. at 484-485. It is well settled that the form at issue is promulgated to satisfy an accused's Sixth Amendment right to counsel which comes into play after criminal proceedings are instituted against a defendant and "cannot reasonably be read to constitute an invocation of right to counsel for purposes of the Fifth Amendment." *Hatcher*, supra at 558; *Turner v. State*, 267 Ga. 149 (5) (476 SE2d 252) (1996). Furthermore, we note that the record is clear that Raulerson did not regard the form as a request for counsel since it was completed after he confessed, and that Raulerson executed an explicit written waiver of counsel prior to making his statement. *Hatcher*, supra at 558.

(c) The trial court did not err when it refused to suppress the evidence seized from Raulerson's residence pursuant to a search warrant. Raulerson contends the magistrate who issued the warrant abandoned his role as a "neutral and detached" judicial officer because he purportedly gave only cursory consideration to the warrant affidavit before issuing the warrant, and that he did so in the sheriff's office in the presence of law enforcement officers. The magistrate judge testified at the suppression hearing he had responded to a late night phone call to his home asking him to come to the sheriff's office. He stopped at his office to obtain the appropriate forms before meeting law enforcement officers at the sheriff's office. He stated that his notes reflected he read the warrant affidavit for four or five minutes before issuing the search warrant.

Neutrality and detachment require " 'severance and disengagement from activities of law enforcement.' [Cits.]" *Tabb v. State*, 250 Ga. 317, 321 (2) (a) (297 SE2d 227) (1982). Construing the evidence most favorably to the trial court's finding and judgment, the magistrate judge gave sufficient consideration to the affidavit before issuing the warrant. *Tate v. State*, 264 Ga. 53 (1) (440 SE2d 646) (1994). Raulerson has not shown the trial court's finding that the magistrate

note that the issue has been decided adversely to him. *Spence v. State*, 252 Ga. 338 (2) (d) (313 SE2d 475) (1984); *Drake v. State*, 245 Ga. 798 (1) (267 SE2d 237) (1980).

judge did not abandon his judicial role to be clearly erroneous. *King v. State*, 263 Ga. 741 (2) (b) (438 SE2d 620) (1994). Since the State met its burden of proving the validity of the warrant, the trial court's denial of Raulerson's motion to suppress was not error. Id.; *Tate v. State*, supra, 264 Ga. at 54.

3. Appellant next complains that the trial court erred when it excused a prospective juror for bias against the death penalty. In order to justify disqualification under *Wainwright v. Witt*, 469 U. S. 412, 424-426 (105 SC 844, 83 LE2d 841) (1985), it must be shown that the juror's views would prevent or substantially impair the performance of his duties as a juror. A juror who merely expresses "qualms" about captial punishment is not subject to being struck for cause. *Jarrell v. State*, 261 Ga. 880 (1) (413 SE2d 710) (1992); *Alderman v. State*, 254 Ga. 206 (4) (327 SE2d 168) (1985). Although the venireperson in question initially stated she could vote for all three punishment options in response to the *Witherspoon*[4] questions, some hesitation in her answers prompted the trial court to question her more closely. From that point forward, the venireperson repeatedly stated that her religious scruples would not permit her to vote for death and she adhered to this position despite Raulerson's attempt to rehabilitate her. The trial court clarified any ambiguity in the venireperson's responses at the close of her voir dire by asking her to tell the court "once and for all" whether she could vote to impose a death sentence. She stated that she could not.

It is not isolated responses, but the "final distillation" of a prospective juror's voir dire which determines whether a juror is qualified to serve. *Waldrip v. State*, 267 Ga. 739 (8) (a) (482 SE2d 299) (1997); *Spivey v. State*, 253 Ga. 187, 197, n. 3 (319 SE2d 420) (1984). In light of the venireperson's repeated statements of her inability to impose the death penalty, the trial court did not err in disqualifying her from service. See *Ledford v. State*, 264 Ga. 60 (6) (b) (439 SE2d 917) (1994).

4. The trial court declined to disqualify another prospective juror for bias. The venireperson had opined that Raulerson was "probably" guilty of the crimes because he was arrested and charged; however, he subsequently stated that he could lay this bias aside and afford Raulerson the presumption of innocence. The trial court did not manifestly abuse its discretion by concluding that the venireperson was not prejudiced. *Diaz v. State*, 262 Ga. 750 (2) (b) (425 SE2d 869) (1993). Although the venireperson responded that he considered police officers to be "a step above the average citizen in respectability" and would credit an officer's testimony over that of another wit-

---

[4] *Witherspoon v. Illinois*, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968).

ness, his later responses to the same questions were equivocal, indicating he was not committed to this position. The venireperson's doubts about his own impartiality did not demand as a matter of law that he be excused for cause. *Greenway v. State*, 207 Ga. App. 511 (3) (428 SE2d 415) (1993). Since his voir dire did not demonstrate he would automatically credit the officer's testimony regardless of other evidence presented at trial, the trial court did not abuse its discretion when it did not excuse the venireperson for cause. *Foster v. State*, 248 Ga. 409 (3) (283 SE2d 873) (1981); *Tennon v. State*, 235 Ga. 594 (2) (220 SE2d 914) (1975).

5. Raulerson contends that the trial court impermissibly restricted voir dire by refusing to allow Raulerson to ask prospective jurors whether they believe mentally retarded defendants should receive more severe punishment than defendants of average intelligence. A prospective juror's opinion of whether a mentally retarded defendant should receive a harsher punishment than an individual of normal intelligence is irrelevant since, under Georgia law, a defendant found by the jury to be mentally retarded cannot be executed and automatically receives a life sentence. OCGA § 17-7-131 (j); *Fleming v. State*, 259 Ga. 687 (386 SE2d 339) (1989). The trial court did not prohibit Raulerson from engaging in relevant voir dire to determine whether jurors harbored any bias towards mentally impaired individuals, such as asking whether they should be held to the same standards of behavior as unimpaired persons. See *Lee v. State*, 258 Ga. 762 (5) (374 SE2d 199) (1988).

The trial court also did not err in refusing to allow Raulerson to ask prospective jurors whether the O. J. Simpson trial affected their attitude towards the criminal justice system. The trial court has discretion to exclude voir dire questions which are not related to the specific case on trial. *Hall v. State*, 259 Ga. 412, 414 (1) (383 SE2d 128) (1989); *Chastain v. State*, 255 Ga. 723 (1) (342 SE2d 678) (1986). Voir dire in this case took five days and fills over 1,400 pages of transcript. The extensive voir dire and the questions permitted by the trial court were sufficient to permit the discovery of bias or prejudice harbored by any prospective juror. *Carr v. State*, 267 Ga. 547 (9) (480 SE2d 583) (1997); *Curry v. State*, 255 Ga. 215 (2) (b) (336 SE2d 762) (1985).

6. Raulerson maintains that the trial court erred in denying his motion for mistrial based on the prosecutor's reference to inadmissible evidence in his opening statement. See *Cargill v. State*, 255 Ga. 616 (21) (a) (340 SE2d 891) (1986). Since Raulerson failed to object to this statement at the time it was made we need only determine whether there is a reasonable probability the remarks, if error, changed the result of the trial. *Todd v. State*, 261 Ga. 766 (2) (a) (410 SE2d 725) (1991). The prosecutor stated in good faith that he antici-

pated the jury would hear gunshots and a scream on a tape of the telephone call made by Gail Taylor to the 911 operator on the morning she was killed. The trial court later excluded the actual tape from evidence, although the jury was aware of its existence, finding that the State failed to lay a sufficient foundation for its admission. Given the evidence in this case, there is no reasonable likelihood that the knowledge that Taylor screamed when she was shot had any effect on the jury's verdict. Id.

7. The trial court did not err in denying Raulerson's untimely motion for mistrial which was based on appellant's character having been placed in issue in violation of OCGA § 24-9-20 (b). A prosecution witness testified that Raulerson was incarcerated on an unrelated aggravated assault charge at the time he confessed to the murders. Appellant sought the mistrial at the close of the evidence. Pretermitting the question of waiver, there was no error since Raulerson opened the door to this evidence by continuously eliciting responses from the State's witness indicating that he was under arrest at the time of the interview for an unrelated crime. *Jordan v. State*, 267 Ga. 442 (4) (480 SE2d 18) (1997). See also *McMichen v. State*, 265 Ga. 598 (4) (b) (458 SE2d 833) (1995).

8. Raulerson argues that evidence of the Pierce County burglary was improperly admitted as similar transaction evidence because the State failed to show the crime was sufficiently similar to the burglary of Gail Taylor's residence. See *Williams v. State*, 261 Ga. 640 (2) (409 SE2d 649) (1991). The trial court admitted evidence of the crime to show Raulerson's bent of mind, in that he engaged in a pattern of criminal behavior that was planned and not random. *Crawford v. State*, 267 Ga. 543 (4) (480 SE2d 573) (1997); *Peppers v. State*, 261 Ga. 338 (2) (404 SE2d 788) (1991). The burglaries were committed three weeks apart in midmorning in residences located in rural areas of adjoining counties and both houses had carports adjoining the house. Raulerson's argument that the crimes were different because the Taylor burglary culminated in her murder is without merit, since by his own account he intended only to steal from Taylor and chose her residence because he thought no one was at home. The crimes were also related because Raulerson stole the rifle used to kill Taylor and the other two victims in the Pierce County burglary.

The admissibility of evidence of other criminal acts by the defendant is not solely determined by the number of similarities between two incidents, particularly where the independent crime is admissible to show bent of mind. *Maggard v. State*, 259 Ga. 291, 293 (2) (380 SE2d 259) (1989). The State made each of the required showings under *Williams v. State*, supra, 261 Ga. at 640; therefore, admission of the similar crime evidence was proper. *Andrews v. State*, 267 Ga. 473 (2) (480 SE2d 29) (1997).

9. The trial court did not err in refusing to give Raulerson's requested instruction on the defense of voluntary intoxication. The charge requested by Raulerson was not legally accurate because it implied that the intoxication defense involves a lack of intent to commit the crime, when intent is a separate issue. *Foster v. State*, 258 Ga. 736 (10) (374 SE2d 188) (1988). The instruction Raulerson now contends should have been given on the inability to form intent as a result of intoxication is not required under Georgia law and was not authorized by the evidence at trial since there was no evidence that Raulerson's intoxication negated his intent to commit the murders. *Brown v. State*, 264 Ga. 48 (3) (d) (441 SE2d 235) (1994); *Horton v. State*, 258 Ga. 489 (8) (371 SE2d 384) (1988). The trial court charged the jury separately on intent and voluntary intoxication. *Horton, supra*. We find no error.

10. There is no merit to Raulerson's challenge to the constitutionality of OCGA § 17-7-131 (c) (3), which requires that the defense of mental retardation be proven beyond a reasonable doubt in order for a jury to return a verdict of "guilty but mentally retarded." *Burgess v. State*, 264 Ga. 777 (36) (450 SE2d 680) (1994).

11. There is no merit to Raulerson's assertion that the State's psychologist, Dr. Gerald Lower, improperly expressed his opinion on Raulerson's credibility. Lower merely testified that certain scores on tests administered to Raulerson by Lower indicated that Raulerson intentionally failed to perform to the best of his ability on the tests. See *Stripling v. State*, supra, 261 Ga. at 3.

12. Raulerson argues that the facts are insufficient to support a finding of the OCGA § 17-10-30 (b) (2) aggravating circumstance, i.e., that the murders of Dixon and Hampton were committed while the defendant was engaged in the commission of kidnapping with bodily injury, because the intent to kidnap Dixon arose after he killed Dixon. Viewed in the light most favorable to the prosecution, the evidence was sufficient to authorize a rational trier of fact to conclude that Raulerson shot both victims in order to abduct and sexually violate Dixon. *Jackson v. Virginia*, supra, 443 U. S. 307. Moreover, the argument lacks merit because the moment when Raulerson formed the intent to kidnap Dixon is not controlling, and Raulerson could be convicted of kidnapping even if the kidnapping was an afterthought to the shootings. *Davis v. State*, 255 Ga. 588 (3) (b) (340 SE2d 862) (1986).

13. Raulerson argues the victim impact testimony offered by the State exceeds the scope of permissible evidence authorized by OCGA § 17-10-1.2 and *Livingston v. State*, 264 Ga. 402 (444 SE2d 748) (1994), which limits such testimony to the impact of the offense upon the victim's family or community. The testimony read by the prosecutor included a statement from Charlye Dixon's father that she was a

senior honor student in high school who planned to marry Jason Hampton; testimony from Jason Hampton's father that at the time of his death, Jason attended college and planned to marry Dixon; and testimony by Gail Taylor's son that Taylor was a nurse and the divorced mother of two children. The testimony was brief, narrow in scope, and revealed facts about the victims which were already known to the jury. The trial court did not abuse its discretion. *Jones v. State*, 267 Ga. 592 (2) (b) (481 SE2d 821) (1997). See also *Turner v. State*, 268 Ga. 213 (486 SE2d 839) (1997).

14. The evidence supports the jury's finding of the following aggravating circumstances: the murder of Charlye Dixon was committed while the offender was engaged in the commission of the murder of Jason Hampton, OCGA § 17-10-30 (b) (2); the murder of Charlye Dixon was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim, OCGA § 17-10-30 (b) (7); the murder of Jason Hampton was committed while the offender was engaged in the commission of kidnapping with bodily injury of Charlye Dixon, OCGA § 17-10-30 (b) (2); the murder of Jason Hampton was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim, OCGA § 17-10-30 (b) (7); the murder of Gail Taylor was committed while the offender was engaged in the commission of a burglary, OCGA § 17-10-30 (b) (2); the offender committed the offense of murder for the purpose of receiving money or any other thing of monetary value, OCGA § 17-10-30 (b) (4); the murder of Gail Taylor was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim, OCGA § 17-10-30 (b) (7).

15. We do not find that Raulerson's death sentence was imposed under the influence of passion, prejudice, or other arbitrary factor. See OCGA § 17-10-35 (c) (1). The death sentence is not excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. The similar cases listed in the Appendix support the imposition of the death sentence in this case.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Wellons v. State*, 266 Ga. 77 (463 SE2d 868) (1995); *McMichen v. State*, 265 Ga. 598 (458 SE2d 833) (1995); *Potts v. State*, 261 Ga. 716 (410 SE2d 89) (1991); *Crawford v. State*, 257 Ga. 681 (362 SE2d 201) (1987); *Childs v. State*, 257 Ga. 243 (357 SE2d 48) (1987); *Devier v. State*, 253 Ga. 604 (323 SE2d 150) (1984); *Chambers v. State*, 250 Ga. 856 (302 SE2d 86) (1983); *Strickland v. State*, 247 Ga. 219 (275 SE2d 29) (1981); *Mulligan v. State*, 245 Ga. 266 (264 SE2d 204) (1980);

*Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976).

DECIDED OCTOBER 10, 1997 —
RECONSIDERATION DENIED NOVEMBER 5, 1997.

*Leon A. Wilson II, John M. Hatfield,* for appellant.
*Richard E. Currie, District Attorney from Waycross Circuit, Alexander J. Markowich, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Wesley S. Horney, Assistant Attorney General,* for appellee.