## S05A0739. WARD v. THE STATE.
### (619 SE2d 638)

THOMPSON, Justice.

Johnny Lee Ward was convicted of malice murder, felony murder, kidnapping, four counts of aggravated assault, seven counts of possession of a firearm during the commission of a crime, burglary, armed robbery, five counts of false imprisonment, and theft by taking.[1] On appeal, he raises the general grounds and asserts that his

---

[4] This is in accord with the legislative purpose of OCGA § 19-6-15 (e). *Ferguson v. Ferguson,* supra at 887 (1).

[1] The crimes occurred on the night of April 20, 2002. Defendant and Mark Anthony were indicted on April 29, 2002, and charged with murder, felony murder, kidnapping, five counts of aggravated assault, burglary, armed robbery, theft by taking, five counts of false imprisonment, and seven counts of possession of a firearm during the commission of a crime. Defendant went to trial on July 7, 2003, and, on July 8, the jury found defendant guilty on all counts, with the exception of one count of aggravated assault. Defendant was sentenced on September 23, 2003,

custodial statement was involuntary and should have been deemed inadmissible. We find no error and affirm.

Gertrude Powell was at home with her son, Willie Powell, and her grandson, Willie Powell, Jr. Another grandson, Calvin Powell, and his two cousins, Larry McTier and Moses Jones, were in front of the house in a rental car. Calvin exited the car and headed to the house. Two gunmen, wearing dark clothing with all but their eyes covered by some sort of bandanna or mask, approached. One gunman put a gun in Moses' face and ordered Moses and Larry out of the car. He forced them to lie face down on the ground and began kicking them and demanding money. The second gunman pointed a gun at Calvin and demanded money. Calvin complied. Then the second gunman ordered Calvin to approach the door of the house. When Gertrude saw that a gun was pointed at Calvin, she opened the door and allowed the second gunman and Calvin to enter. The gunman forced Willie Sr. to the floor, kicked him, and demanded money. Willie Sr. gave the gunman the money in his pocket. Calvin attempted to run back to the rental car to retrieve a gun, but the second gunman fired a shot in his direction and ordered him back inside. In the meantime, Willie Jr. emerged from his room, but only briefly because the gunman immediately instructed him to go back.

Meanwhile, Moses and Larry were still being questioned and kicked on the ground. Moses heard a shot and turned to look; he saw Larry stand and fall against the car. Moses and Larry then ran in opposite directions. Moses heard gunshots racing past him as he dove into the bushes. The gunman pursued Larry, and then returned and acted as a lookout by the door. The second gunman came out of the house and said, "I got it." Then both gunmen jumped into the rental car and sped off.

The family called the police and began searching for Larry. They found Larry in a ditch, still breathing. He died later from a gunshot wound.

Shortly before these events, Alonzo Boyd saw defendant and Mark Anthony leave their neighborhood. At that time, they were wearing light-colored clothing. About an hour to an hour and a half later, they returned wearing dark-colored clothing.

to life for malice murder, 20 years for the kidnapping, burglary and armed robbery counts, 20 years for the aggravated assault counts (to be served concurrently but consecutive to the kidnapping count), five years on the firearm possession counts (served concurrently but consecutive to the burglary count), and five years on the false imprisonment and theft by taking counts. The felony murder count was vacated as a matter of law. Defendant's timely filed motion for a new trial was denied on October 19, 2004, and defendant filed a notice of appeal on October 22, 2004. The case was docketed in this Court on January 11, 2005, and submitted for decision on briefs on March 7, 2005.

Defendant was arrested two days later on an unrelated firearm charge. The next day, GBI Agent Doug Parker interviewed defendant. During the interview, defendant stated that Anthony asked him to help collect some money; that Anthony drove defendant, Anthony's cousin, "Desmond," and "Fonz" in Anthony's car, that they were all wearing black, and that they all had guns. He said that they parked on a logging road near Gertrude Powell's house and approached on foot; that he waited outside the house while the others went inside; and that shots were fired inside the house and someone yelled, "I have been shot." Defendant also stated that while he was waiting outside of the house for the others, he fired his gun in the air; that the foursome then left Powell's house; that Anthony and "Fonz" drove off in the rental car, and defendant and Desmond departed in Anthony's car; and that the group met up briefly to throw the victim in a ditch, after which Desmond dropped defendant off at home. It was unclear from defendant's statement as to how and where the foursome caught up with the victim prior to throwing him in the ditch.

After a few days, defendant told Agent Parker that he did not know anything about Larry's death and that all of the information he had about the crime came from Alonzo Boyd, who had been talking about the crime with everyone.

At trial, defendant testified that he had no knowledge of the murder and only gave the statement to Agent Parker to "tell him what he wanted to hear" and "to get him off [his] back." Defendant further averred that he had been at a family party until approximately 10:00 p.m. on the night of the murder, and that later that evening he joined Anthony at McDonald's.

1. Although none of the surviving victims could identify defendant as their assailant, the evidence was sufficient to enable any rational trier of fact to find defendant guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Blackwell v. State*, 270 Ga. 509, 510 (512 SE2d 233) (1999). See also *Chapman v. State*, 275 Ga. 314, 315 (565 SE2d 442) (2002). The conviction was not based solely upon defendant's uncorroborated confession. See *Chapman v. State*, supra.

2. Defendant asserts his custodial statement was involuntary and should have been ruled inadmissible. We disagree. A trial court's factual and credibility findings as to the voluntariness of a custodial statement are to be accepted on appeal unless they are clearly erroneous. *Raulerson v. State*, 268 Ga. 623, 626 (2) (b) (491 SE2d 791) (1997). The trial court conducted a *Jackson-Denno* hearing and determined that defendant's statement was voluntary. The evidence amply supports the trial court's determination. Prior to interviewing defendant, Agent Parker advised him of his *Miranda* rights; he made

sure that defendant understood his rights; and he saw defendant sign the waiver of rights form. In addition, the agent established that defendant received a ninth grade education and that defendant was not affected adversely by his failure to take prescribed medication (Ritalin) for two weeks. Contrary to defendant's assertion, the statement was not rendered inadmissible simply because (1) Agent Parker instructed officers at the jail not to allow defendant to have any visitors or make any phone calls;[2] (2) the statement was not recorded in its entirety;[3] or (3) Agent Parker stopped the recording and brought Anthony into the interview room to determine if defendant was the person Anthony claimed to be with at McDonald's on the night in question.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 19, 2005.

*Samuel W. Cruse*, for appellant.
*Daniel J. Craig, District Attorney, Charles R. Sheppard, Assistant District Attorney, Thurbert E. Baker, Attorney General, Raina J. Nadler, Assistant Attorney General*, for appellee.

---

[2] Agent Parker put this instruction into effect for a short time because he was concerned that defendant would try to get someone to destroy physical evidence which the GBI was trying to collect.

[3] It is standard GBI practice not to tape-record a custodial statement until the interviewee is comfortable and willing to talk on tape.