### S99P0647. PACE v. THE STATE.
(524 SE2d 490)

HINES, Justice.

A jury convicted Lyndon Fitzgerald Pace of four counts of malice murder, four counts of felony murder, four counts of rape, and two counts of aggravated sodomy. The jury recommended a death sentence for each malice murder conviction after finding beyond a reasonable doubt the existence of 19 statutory aggravating circumstances. OCGA § 17-10-30 (b) (2), (7). Pace appeals and we affirm.[1]

1. The evidence adduced at trial shows that four women were murdered in their Atlanta homes in 1988 and 1989. On August 28, 1988, a roommate found the nude body of 86-year-old Lula Bell McAfee lying face-down on her bed. She had been sexually assaulted and strangled to death with a strip of cloth. On September 10, 1988, Mattie Mae McLendon, 78 years old, was found lying dead on her bed covered by a sheet. She had been sexually assaulted and strangled to death. No ligature was found. On February 4, 1989, the police discovered the body of 79-year-old Johnnie Mae Martin lying on her bed nude from the waist down. She had been sexually assaulted and

---

[1] Pace was indicted on June 22, 1993, for malice murder (four counts), felony murder (four counts), rape (four counts), and aggravated sodomy (two counts). The State filed a notice to seek the death penalty on August 13, 1993. Pace's trial took place from January 22 to March 7, 1996. Pace was convicted of all counts on March 5, 1996, and the jury recommended four death sentences for the malice murder convictions on March 7, 1996. In addition to the death sentences, the trial court sentenced Pace to six consecutive life sentences for the rape and aggravated sodomy convictions. The felony murder convictions were vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993). Pace filed a motion for new trial on March 14, 1996, which was amended on August 12, 1997, and denied by the trial court on July 8, 1998. Pace filed a notice of appeal on August 7, 1998, and this case was docketed in this Court on February 2, 1999. This case was orally argued on May 5, 1999.

strangled to death with a shoelace. On March 4, 1989, the brother-in-law of 42-year-old Annie Kate Britt found her body lying on her bed. She had been sexually assaulted and strangled to death with a sock that was still knotted around her neck.

The police determined that the killer entered each victim's home by climbing through a window. Each attack occurred in the early morning hours. Vaginal lacerations and the presence of semen indicated that the victims had been raped and two of the women had been anally sodomized. The medical examiner removed spermatozoa from each victim and sent the samples to the FBI lab. DNA testing revealed the same DNA profile for each sperm sample, indicating a common perpetrator.

At 3:00 a.m. on September 24, 1992, 69-year-old Sarah Grogan confronted an intruder in her kitchen. She managed to obtain her gun and fire a shot which forced him to flee. The police discovered that the intruder entered Ms. Grogan's house by climbing through a window. A crime scene technician lifted fingerprints from Ms. Grogan's kitchen. At 2:00 a.m. on September 30, 1992, Susie Sublett, an elderly woman who lived alone, awoke to discover an intruder taking money from her purse in her bedroom. Although the intruder was armed and threatened to "blow [her] brains out," she fought with him and managed to flee to a neighbor's house. The neighbor called the police. The police determined that the intruder entered Ms. Sublett's house by climbing through a window. A crime scene technician lifted fingerprints from Ms. Sublett's window screen.

The fingerprints from the Sublett and Grogan crime scenes matched Pace's fingerprints, which were already on file with the police. Pace was arrested and agreed to give hair and blood samples to the police. Pace's pubic hair was consistent with a pubic hair found on the sweat pants Annie Kate Britt wore on the night she was murdered, and with a pubic hair found on a sheet near Johnnie Mae Martin's body. A DNA expert also determined that Pace's DNA profile matched the DNA profile taken from the sperm in the McAfee, Martin, McLendon, and Britt murders. The expert testified that the probability of a coincidental match of this DNA profile is one in 500 million in the McAfee, Martin, and Britt cases, and one in 150 million in the McLendon case.[2]

The evidence was sufficient to enable a rational trier of fact to find beyond a reasonable doubt proof of Pace's guilt of four counts of malice murder, four counts of felony murder, four counts of rape, and two counts of aggravated sodomy. *Jackson v. Virginia*, 443 U. S. 307

---

[2] The expert obtained six-probe matches in the McAfee, Martin, and Britt cases, and a four-probe match in the McLendon case.

(99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find beyond a reasonable doubt the 19 statutory aggravating circumstances which support his death sentences for the murders. *Jackson v. Virginia*, supra; OCGA § 17-10-35 (c) (2).

2. Pace was arrested for the crimes against Ms. Sublett on October 2, 1992. At that time, the police were investigating the September 1992 murder of an elderly woman named Mary Hudson that they believed might be connected to the murders of McAfee, McLendon, Martin, and Britt. Because of the similarities between the Sublett robbery and the Hudson murder, the police sought Pace's consent to obtain hair and blood samples. The consent form that Pace signed states, in part: "I fully understand that these hair and bodily fluid samples are to be used against me in a court of law and I am in agreement to give these hair samples for further use in this particular investigation." The form further stated that Pace was a suspect in a murder which occurred on September 17 and the "name of the murder victim in this case is Mary Hudson." There was no mention of the other four murders. The FBI and GBI crime labs were subsequently unable to match Pace's DNA or hair to any evidence from the Hudson murder, but were able to obtain matches with evidence from the McAfee, McLendon, Martin, and Britt cases.

Pace claims that he did not voluntarily consent to the drawing of his blood and the collection of his hair for use in the investigation of the four murders for which he was convicted. He argues that the police exceeded the bounds of his consent by using his blood and hair in investigations of murders other than the Hudson murder, and that the police obtained his consent through deceit because he believed that his hair and blood would be used only in the Hudson investigation. See *State v. Long*, 232 Ga. App. 445 (502 SE2d 298) (1998); *State v. Jewell*, 228 Ga. App. 825 (492 SE2d 706) (1997); *State v. Gerace*, 210 Ga. App. 874 (437 SE2d 862) (1993); *Beasley v. State*, 204 Ga. App. 214 (1) (419 SE2d 92) (1992). After a suppression hearing, the trial court found that Pace's consent was voluntary, and we agree with the trial court. Most of the cases cited by Pace in support of his argument involve the giving of consent under the implied consent statute to test blood for the presence of alcohol or drugs while operating a motor vehicle. See OCGA § 40-5-55; *Long*, supra (defendant charged with possession of cocaine after consenting to blood test upon receiving implied consent warning); *Gerace*, supra (defendant charged with rape and aggravated sodomy based on DNA obtained from blood sample drawn after consent under implied consent statute). The implied consent warning specifically limits the purpose of the testing to a determination of whether the driver is under the influence of alcohol or drugs. OCGA § 40-5-67.1.

Pace's situation is distinguishable from an implied consent case.

See *Bickley v. State*, 227 Ga. App. 413 (1) (b) (489 SE2d 167) (1997); *Gadson v. State*, 223 Ga. App. 342 (4) (477 SE2d 598) (1996). The consent form signed by Pace states that his blood and hair will be used against him in a court of law and that he was a suspect in the Hudson murder. However, unlike an implied consent warning, the form does not limit the use of the blood or hair to only the Hudson murder investigation or to any particular purpose, and there is no evidence that Pace placed any limits on the scope of his consent. See *Gadson*, supra. Compare *Beasley*, 204 Ga. App. at 214-217 (1) (defendant's consent involuntary because he was told his urine sample would be used to determine bond eligibility, not for criminal prosecution). The police were not required to explain to Pace that his blood or hair could be used in prosecutions involving other victims, or that he had a right to refuse consent. *Gadson*, supra; *Woodruff v. State*, 233 Ga. 840 (3) (213 SE2d 689) (1975). Further, like a fingerprint, DNA remains the same no matter how many times blood is drawn and tested and a DNA profile can be used to inculpate or exculpate suspects in other investigations without additional invasive procedures. It would not be reasonable to require law enforcement personnel to obtain additional consent or another search warrant every time a validly-obtained DNA profile is used for comparison in another investigation. See *Bickley*, supra.

Additional evidence at the suppression hearing shows that when Pace gave his consent he was 28 years old, was advised of and waived his rights, was not coerced or threatened, was not under the influence of drugs or alcohol, and was not handcuffed. The evidence does not support Pace's claim that there was deceit involved in obtaining his consent. Upon viewing the totality of the circumstances, we conclude that the trial court did not err in finding Pace's consent to be voluntary. See *Raulerson v. State*, 268 Ga. 623 (2) (a) (491 SE2d 791) (1997). In addition, Pace was arrested pursuant to a valid arrest warrant for the armed robbery of Ms. Sublett. We find no error with the trial court's rulings regarding Pace's consent to the police obtaining samples of his hair and blood.

3. The trial court did not abuse its discretion by denying Pace's motion to sever the murder counts.

> Two or more offenses may be joined in one charge when the offenses are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan and where it would be almost impossible to present to a jury evidence of one of the crimes without permitting evidence of the other.

*Bright v. State*, 265 Ga. 265 (7) (455 SE2d 37) (1995). See also *Wil-*

liams v. State, 251 Ga. 749 (16) (312 SE2d 40) (1983); Dingler v. State, 233 Ga. 462 (211 SE2d 752) (1975). Even if severed, evidence of all four murders would have been admissible in the same trial to show identity. Williams v. State, 261 Ga. 640 (2) (b) (409 SE2d 649) (1991).

4. The State is permitted to charge a defendant with malice murder and felony murder for the same homicide and proceed to trial and obtain convictions on both murder counts. Malcolm v. State, 263 Ga. 369 (4) (434 SE2d 479) (1993); Dunn v. State, 251 Ga. 731 (5) (309 SE2d 370) (1983). Since Pace was not sentenced for his felony murder convictions, there is no error. Malcolm, supra.

5. Pace claims that the trial court failed to grant an order limiting conversations between the bailiffs and the jury. However, there is no allegation of any improper conduct between the bailiffs and the jury. Therefore, this contention presents no error.

6. Pace argues that 27 of his pretrial motions were denied without an evidentiary hearing, and that the failure of the trial court to hold an evidentiary hearing on each motion abridged his "right to be heard." The record shows that Pace was allowed to file any motions he desired accompanied by supporting briefs. The trial court also held hearings at which Pace's counsel was afforded the opportunity to argue each motion. Contrary to Pace's assertion, the trial court is not required by the Unified Appeal Procedure to hold an evidentiary hearing on every motion but is required to hold a hearing where each motion previously filed is heard. Unified Appeal Procedure Rule II (B). The trial court complied with the Unified Appeal Procedure and Pace was given the opportunity to be heard on every motion. Also, Pace could have made an evidentiary proffer with regard to each motion and did make proffers for some of these motions. See Mincey v. State, 251 Ga. 255 (2) (304 SE2d 882) (1983). We further note, as did the trial court, that most of these motions have been repeatedly decided adversely to similarly situated defendants by this Court.[3] Id. We find no error.

7. "The death qualification of prospective jurors is not unconstitutional." Cromartie v. State, 270 Ga. 780 (5) (514 SE2d 205) (1999). Pace complains that 18 prospective jurors were biased in favor of the

---

[3] The 27 pretrial motions decided without an evidentiary hearing include: a motion to bar execution by electrocution, several motions challenging the constitutionality of the death penalty, a motion to require the district attorney to respond to Pace's motions in writing, a motion to require the judge to reveal any basis for recusal, a motion to remove the Georgia flag from the courtroom, a motion to bar victim-impact evidence, a motion to make the Georgia statutes providing for victim-impact evidence non-retroactive, a motion to pay current wages and day care costs to jurors who are primary caregivers, motions to strike the murder, rape and aggravated sodomy statutes as unconstitutional, and a motion to make the jurors' notes part of the record.

death penalty and were erroneously qualified to serve by the trial court. "The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985). Our review of the trial court's qualification of the prospective jurors is based upon a consideration of the voir dire as a whole, and we must afford deference to the trial court's resolution of any equivocations and conflicts in the prospective jurors' responses. *Greene*, supra at 49. A prospective juror is not subject to excusal for cause for merely leaning for or against a death sentence. Id. at 53; *Jarrell v. State*, 261 Ga. 880 (1) (413 SE2d 710) (1992). After reviewing the voir dire transcript, we conclude that the trial court did not err by denying Pace's motions to disqualify prospective jurors who were allegedly predisposed to a death sentence.

8. The trial court did not err by failing to excuse several prospective jurors for cause due to exposure to pretrial publicity and alleged bias against Pace. " 'In order to disqualify a juror for cause, it must be established that the juror's opinion was so fixed and definite that it would not be changed by the evidence or the charge of the court upon the evidence.'" *DeYoung v. State*, 268 Ga. 780 (4) (493 SE2d 157) (1997), quoting *Chancey v. State*, 256 Ga. 415 (3) (B) (349 SE2d 717) (1986). The record shows that these jurors could set their opinions aside and decide the case based on the evidence presented at trial and the trial court's instructions. See id.

9. Pace claims that the trial court erred by excusing four prospective jurors for cause. Prospective jurors Williams and Oldham knew Pace when he was a boy, could not be impartial, and could never vote for the death penalty. The trial court was authorized to excuse them for cause. *Wainwright*, 412 U. S. at 424 (II); *Greene*, 268 Ga. at 48-50. Prospective juror Holland was also properly removed for cause after she stated she was opposed to the death penalty, had no doubt she would always vote for a life sentence, and her views against the death penalty would impair her consideration of the guilt-innocence phase evidence. Id. Prospective juror Russell claimed a hardship due to anxiety attacks. He said that during these attacks he gets "fatigued out," his thinking becomes confused and "off," and he once passed out. Against doctor's orders, he had stopped taking his medication because he did not want it to affect his mind. When asked what contributes to his anxiety attacks, he mentioned "things happening in society" like "killing." He stated that Pace's case scared him and he did not think he could be fair and impartial because he would "start getting nervous." The trial court was authorized to remove this

juror for cause. See *Brown v. State*, 268 Ga. 354 (3) (490 SE2d 75) (1997) (whether to strike a juror for cause lies within the trial court's discretion).

10. Pace contends that the trial court erred by failing to excuse for cause two prospective jurors with ties to law enforcement. Prospective juror Gholston was a corrections officer and prospective juror Jester was a security guard who had applied to join the Atlanta Police Department. However, since neither prospective juror was a sworn police officer with arrest power, they were not subject to an excusal for cause on this basis. *Barnes v. State*, 269 Ga. 345 (8) (496 SE2d 674) (1998); *Thompson v. State*, 212 Ga. App. 175 (1) (442 SE2d 771) (1994) (corrections officers without arrest power are not automatically excused for cause); *Dixon v. State*, 180 Ga. App. 222 (5) (348 SE2d 742) (1986) (private security guard not subject to automatic excusal for cause).

11. Pace claims that the State improperly struck female prospective jurors based on their gender. *J.E.B. v. Alabama*, 511 U. S. 127 (114 SC 1419, 128 LE2d 89) (1994); *Tedder v. State*, 265 Ga. 900 (2) (463 SE2d 697) (1995). The State used eight of ten peremptory strikes to remove females from the jury. Pace made a *J.E.B.* motion regarding five of the women struck by the State and the trial court required the State to give reasons for these strikes. The main reason given for striking these five jurors was that each had expressed reservations about the imposition of the death penalty; the record supports this reason and the other reasons given by the State. Therefore, we conclude that the State adequately explained each strike "on a basis which was 'gender-neutral, reasonably specific, and related to the case.'" *Berry v. State*, 268 Ga. 437 (2) (490 SE2d 389) (1997), quoting *Tedder*, supra. See also *Tharpe v. State*, 262 Ga. 110 (6) (416 SE2d 78) (1992) (a prospective juror's aversion to the imposition of a death sentence is an adequate reason to justify a peremptory strike). We find no error with the trial court's denial of Pace's *J.E.B.* motion.

12. Bruce Harvey, a well-known attorney, was one of the lawyers representing Pace at trial. During general voir dire of all the prospective jurors, the trial court asked if anyone had formed or expressed an opinion regarding Pace's guilt or innocence. A juror responded in a manner that Pace claims should have disqualified the entire panel. The colloquy went as follows:

TRIAL COURT: Just have a seat and we'll come back to you. Anyone else?
PROSPECTIVE JUROR: Juror number 7.
TRIAL COURT: You have formed and expressed an opinion?
PROSPECTIVE JUROR: When I saw Mr. Harvey in the room, I said most of his clients —

TRIAL COURT: No. I just wanted to know have you expressed an opinion?

PROSPECTIVE JUROR: Yes, I have.

Pace moved to disqualify the entire panel based on these remarks, but the trial court denied the motion. We conclude that Pace shows no harm from this ruling because the prospective juror was stopped before she said anything prejudicial, if she was planning to say anything prejudicial. See *Robinson v. State*, 229 Ga. 14 (1) (189 SE2d 53) (1972) (harm as well as error must be shown to authorize a reversal).

13. Contrary to Pace's assertion, the trial court did not tell the prospective jurors that they were expected to convict Pace and proceed to the second phase of the trial. Informing prospective jurors that death penalty trials are conducted in two phases, with the second phase conditional on a guilty verdict in the first phase, is not improper.

14. The trial court did not abuse its discretion by refusing to permit Pace to question prospective jurors about bumper stickers they had on their cars. *Alderman v. State*, 254 Ga. 206 (3) (327 SE2d 168) (1985). The trial court also did not impermissibly restrict the scope of Pace's voir dire of prospective jurors. The scope of voir dire and the propriety of particular questions are left to the sound discretion of the trial court, and the voir dire in this case was sufficient to ascertain any bias held by a prospective juror. See *Waldrip v. State*, 267 Ga. 739 (9) (482 SE2d 299) (1997).

15. Pace was not denied a fair trial by the trial court's refusal to pay the child care costs of prospective jurors who were primary caregivers. *McMichen v. State*, 265 Ga. 598 (33) (458 SE2d 833) (1995).

16. Pace claims the trial court erred by excusing for cause 19 prospective jurors because they would never vote to impose the death penalty for religious reasons. He contends that the removal of a juror due to religious opposition to the death penalty violates the State and Federal Constitutions. This argument has been decided adversely to Pace. *Cromartie v. State*, supra. "The standard for excusing a prospective juror based upon the prospective juror's views on the death penalty draws no religious or secular distinction." Id. The record shows that the trial court did not erroneously excuse any prospective jurors who were biased against the death penalty. See *Wainwright*, 469 U. S. at 424 (II); *Greene*, 268 Ga. at 48-50.

17. Pace claims that the State failed to provide exculpatory evidence to him in violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). During the guilt-innocence phase of the trial, a medical examiner testified about the autopsies of the four victims, three of which he had personally performed or supervised. He

testified about the fourth autopsy pursuant to a stipulation by Pace. After the medical examiner completed his testimony, while the State was still presenting its case, a prosecutor noticed a report that she had not seen before about the murders in the notebook of a State's witness. Completed before Pace's arrest, the report is a psychological profile prepared by GBI agents about the killer of the four women. It appears to summarize what was known about the circumstances of the murders and speculates about the killer's characteristics and the manner in which the crimes were committed. The prosecutor immediately provided the report to Pace's counsel.

After receiving the report, Pace moved for a mistrial on *Brady* grounds. Pace claimed that some of the information in the report was exculpatory and that the report differed significantly from the medical examiner's testimony. The report contains information supposedly provided by medical examiners that two of the women had been vaginally penetrated by an object other than a penis (possibly a hand) and that the anal sodomy had occurred postmortem. Pace also moved to strike the medical examiner's testimony and withdraw his stipulation. Pace moved for a continuance to contact the authors of the report, which was granted.

The record shows that the medical examiners who performed the autopsies and the GBI agents who authored the report were contacted. The medical examiners denied supplying any reports to law enforcement personnel in addition to the autopsy reports, which were provided to Pace before trial. They maintained that they had never said the victims were not raped. One of the GBI agents who authored the report said there was nothing in his notes indicating that he had spoken with the medical examiners. In addition, the transcript of the medical examiner's trial testimony shows that he did in fact testify before the jury that anal trauma to one of the victims probably occurred postmortem. The trial court ruled that Pace had obtained all the information regarding the report and denied the motions for a further continuance, a strike of the medical examiner's testimony, and a mistrial. The State had not rested in the guilt-innocence phase, and the trial court informed Pace that he could recall the medical examiner for additional cross-examination. Pace declined.

We find no error with the trial court's rulings regarding the psychological profile. The information that Pace alleges was exculpatory (the possibility that the vaginal penetration of two of the victims was by an object other than a penis and that the anal sodomy had been postmortem) was in the report provided to Pace during the trial when he could still have used it to cross-examine the medical examiner. See *Dennard v. State*, 263 Ga. 453 (4) (435 SE2d 26) (1993) (there is no *Brady* violation when the alleged exculpatory evidence is available to the accused at trial); *Castell v. State*, 250 Ga. 776 (2) (b) (301 SE2d

234) (1983). Moreover, the medical examiner did testify that the anal sodomy of one of the victims may have been postmortem. See *Davis v. State*, 261 Ga. 382 (8) (b) (405 SE2d 648) (1991) (there is no *Brady* violation when the alleged exculpatory evidence is presented to the jury at trial). Pace has failed to show that the disclosure of the psychological profile came so late as to deny him a fair trial. See *Dennard*, supra; *Blankenship v. State*, 258 Ga. 43 (4) (365 SE2d 265) (1988). Pace's additional *Brady* claim, that the State suppressed information that a neighbor of Annie Kate Britt heard an argument on the night of her murder, is without merit for the same reason; Pace knew this information at trial and used it to cross-examine a police witness. See *Dennard*, supra; *Davis*, supra.

18. Several times during the guilt-innocence phase, Pace attempted to cross-examine witnesses about other suspects in the murders and the trial court sustained the State's objections to the questions. Pace claims the repeated interference with defense questioning about other suspects violated his right to a fair trial. A defendant is entitled to introduce relevant and admissible testimony tending to show that someone else committed the crimes for which he is being tried. *Klinect v. State*, 269 Ga. 570 (3) (501 SE2d 810) (1998). "However, the proffered evidence must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delecti, or show that the other person has recently committed a crime of the same or similar nature." Id. The record shows that Pace was sometimes able to ask witnesses about other suspects without objection, and that the answers to these questions failed to show that anyone else was connected to the murders. With regard to the questions that Pace was prevented from asking, there is no defense proffer that shows another person was reasonably connected to any of the murders. See id.; *Croom v. State*, 217 Ga. App. 596 (3) (458 SE2d 679) (1995) (evidence that only casts a bare suspicion on another or raises only a conjectural inference of another's guilt is not admissible). In addition, Pace was often prevented from asking about other suspects because he sought to elicit inadmissible hearsay. After review of the record, we conclude that the trial court did not abuse its discretion by limiting Pace's questions regarding other suspects. *Klinect*, supra.

19. The burglaries of Ms. Sublett's and Ms. Grogan's homes were properly admitted as similar transactions to show identity, scheme, and course of conduct. See *Freeman v. State*, 264 Ga. 27 (1) (440 SE2d 181) (1994); *Williams v. State*, 261 Ga. at 640 (2).

20. Pace's claim that a State's witness provided false testimony is without merit. A police detective testified that Pace was arrested pursuant to an arrest warrant for the murder of Ms. McAfee. After Pace objected, the witness corrected himself and stated that Pace was

not originally arrested for Ms. McAfee's murder. We find no error.

21. Pace argues two errors with regard to the State's use of hair comparison evidence.

(a) *Denial of the motion for continuance.* At a hearing in September 1995, a prosecutor stated that he would not introduce hair comparison evidence. However, on January 19, 1996, three days before the start of trial, the State served a copy of a Crime Lab report on Pace showing that Pace's pubic hair was microscopically similar to pubic hairs found at two of the murder scenes. Pace moved for a continuance to prepare to counter this evidence. The prosecutor stated that he had wanted the Crime Lab to examine the hairs much earlier, but that the Crime Lab had refused because it was their policy not to further test "trace evidence" when they already had a DNA match. The prosecutor managed to prevail on the Crime Lab to conduct the hair testing in January 1996, and the prosecutor gave the report to the defense as soon as it was received. The trial court denied Pace's motion for a continuance after noting that voir dire was expected to last four-six weeks (the guilt-innocence phase did not start until February 20). The trial court also stated that it would provide funds for Pace to hire his own hair comparison expert, require the Crime Lab's microanalyst to meet with the defense ex parte, and conduct a separate hearing during the trial to allow the defense to question the Crime Lab's microanalyst about the reliability of hair comparison evidence before it was admitted. We find no error. The remedy for late notice of a scientific report is a continuance at the trial court's discretion. See OCGA § 17-8-22; *Wade v. State*, 258 Ga. 324 (6) (368 SE2d 482) (1988); *Wilburn v. State*, 199 Ga. App. 667 (3) (405 SE2d 889) (1991). Because of the time remaining before the presentation of the State's case and the measures taken to permit the defense to prepare for the State's anticipated hair comparison evidence, we find that the trial court did not abuse its discretion in denying the motion for a continuance. See OCGA § 17-8-22; *Johnson v. State*, 209 Ga. App. 395 (1) (433 SE2d 638) (1993).

(b) *The scientific reliability of hair comparison evidence.* Pace claims that hair comparison evidence does not satisfy a constitutional standard of reliability to permit its admission in this case. See *Harper v. State*, 249 Ga. 519 (1) (292 SE2d 389) (1982). After voir dire of her training and experience, the trial court found that the Crime Lab's microanalyst was an expert in the field of hair comparison; we find no abuse of discretion in her acceptance as an expert. See *Carr v. State*, 267 Ga. 701 (6) (482 SE2d 314) (1997). A hearing on the admissibility of hair comparison evidence was conducted and the trial court found this type of evidence had reached a scientific stage of reliability sufficient to satisfy the standard in *Harper*. See *Harper*, supra. Further, hair comparison evidence is not novel and has been widely

accepted in Georgia courts. *Whatley v. State*, 270 Ga. 296 (6) (509 SE2d 45) (1998); *Pye v. State*, 269 Ga. 779 (13) (505 SE2d 4) (1998). "Once a procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature." *Harper*, supra. We find no error with the trial court's determination that the hair comparison evidence was admissible. See *Williams v. State*, 251 Ga. at 749 (1); *Harper*, supra.

22. We find no error in the denial of several of Pace's requests to charge in both phases of the trial. The trial court is not required to identify specific mitigating circumstances in its sentencing phase jury charge as long as the jury is charged that it could return a life sentence for any reason or no reason. See *Jenkins v. State*, 269 Ga. 282 (24), (25) (498 SE2d 502) (1998).

23. The guilt-innocence phase jury charge on the consideration of hair comparison and DNA evidence was not improper. OCGA § 24-4-6. During the guilt-innocence phase deliberations, the jury requested a recharge on the definitions of robbery and burglary, which were underlying felonies for the felony murder counts, and the trial court complied. Pace claims that the recharge unduly emphasized robbery and burglary because the trial court did not re-instruct the jury that these were only supporting felonies for felony murder. We find no error. See *Williams v. State*, 263 Ga. 135 (4) (429 SE2d 512) (1993) (trial court does not err by limiting recharge to the specific question raised by the jury). Further, this claim is unsupported by the record, which shows that the trial court ensured that the jury understood at the beginning of the recharge that these felonies were underlying felonies for felony murder.

24. The FBI DNA analyst was properly qualified as a forensic DNA analysis expert. See *Carr*, 267 Ga. at 708 (6). Pace's claim that the DNA expert should have been prevented from testifying about DNA test materials which were not in evidence is without merit. See *Cook v. State*, 270 Ga. 820 (7) (514 SE2d 657) (1999). The DNA expert testified that he supervised the technicians who performed the testing and he performed the analysis of the results himself. Id. The trial court also did not improperly curtail cross-examination about criticism of the FBI laboratory.

25. Photographs of the crime scenes and the victims were relevant and admissible. See *Jenkins*, 269 Ga. at 293 (20). The use of a screen to enlarge the photographs was not improper because there is no evidence of distortion. *Smith v. State*, 270 Ga. 240 (9) (510 SE2d 1) (1998).

26. The State did not need to prove a chain of custody for Ms. Britt's sweat pants and a pillow that were admitted into evidence

because they are non-fungible items that can be recognized by observation. See *Mize v. State*, 269 Ga. 646 (5) (501 SE2d 219) (1998). Witnesses identified these items as evidence found at the crime scenes and this testimony is sufficient to authorize the jury to consider them. See *Harper v. State*, 251 Ga. 183 (1) (304 SE2d 693) (1983).

27. The State's closing argument in the guilt-innocence phase was not reversible error. See *Conner v. State*, 251 Ga. 113 (6) (303 SE2d 266) (1983) (the permissible range of closing argument is very wide). The argument that the Crime Lab microanalyst's work had been "peer-reviewed" was proper because the microanalyst testified that her work had been peer-reviewed. The comment that Pace's hair "matched" crime scene hairs was a permissible inference, see *Todd v. State*, 261 Ga. 766 (2) (a) (410 SE2d 725) (1991); in addition, after Pace's objection, the prosecutor clarified that the hairs were "microscopically similar, such as to have a common origin." The "send a message" argument is permissible in the guilt-innocence phase. See *Philmore v. State*, 263 Ga. 67 (3) (428 SE2d 329) (1993). Lastly, Pace complains that the prosecutor committed misconduct by characterizing Pace as a "misogynistic, woman hating demon of the devil" and "Satan's lap dog." He moved for a mistrial, which was denied by the trial court. We find that these characterizations of the defendant were unprofessional and should not have been made. See *Simmons v. State*, 266 Ga. 223 (6) (b) (466 SE2d 205) (1996); *Bell v. State*, 263 Ga. 776, 778, n. 1 (439 SE2d 480) (1994). However, the grant of a mistrial for improper argument is a matter largely within the trial court's discretion, *Jordan v. State*, 247 Ga. 328 (11) (276 SE2d 224) (1981), and we do not conclude that this single portion of the closing argument warrants a reversal of the convictions in light of the overwhelming evidence of Pace's guilt. See *Kyler v. State*, 270 Ga. 81 (10) (508 SE2d 152) (1998); *Carter v. State*, 269 Ga. 891 (5) (506 SE2d 124) (1998); *Miller v. State*, 226 Ga. 730 (5) (177 SE2d 253) (1970). We also evaluate the possible prejudicial effect of these remarks with regard to the death sentences in enumeration 36, as part of our review to ensure that the death sentences were not improperly rendered due to the influence of passion, prejudice, and other arbitrary factors. OCGA § 17-10-35 (c) (1); *Spivey v. State*, 253 Ga. 187 (4) (319 SE2d 420) (1984) (this Court reviews the entire record to ensure that the death penalty is not arbitrarily imposed).

28. An investigator for the medical examiner's office testified that he transported some evidence from the murders to the Crime Lab in a sealed paper bag. However, he could not remember to whom he delivered the bag at the Crime Lab, and the trial court allowed the State to refresh his memory with a Crime Lab report generated in 1996. Pace claims that this was error because the document was created seven years after the investigator delivered the evidence. We

disagree. Any document may be used to refresh the recollection of a witness, including documents not prepared by the witness. OCGA § 24-9-69; *Woods v. State*, 269 Ga. 60 (3) (495 SE2d 282) (1998). Additionally, although the investigator still could not remember to whom he gave the bag, the chain of custody was established because an employee of the Crime Lab testified she received it from the investigator. See *Stephens v. State*, 259 Ga. 820 (3) (388 SE2d 519) (1990).

29. There is no fatal variance resulting from the indictment alleging that Pace choked Ms. McAfee to death with his hands and the evidence at trial showing that she was choked with a ligature. See *Battles v. State*, 262 Ga. 415 (5) (420 SE2d 303) (1992). There are no fatal variances with regard to any of the other counts in the indictment. See id.

30. In the sentencing phase, Pace presented Mary Booker, a family friend, who testified that she had received several inspiring letters from Pace while he was in jail awaiting trial. One of the letters was admitted into evidence; Ms. Booker said that she had thrown out the other letters. When Pace's counsel asked her what was in the letters she had thrown out, the State objected on hearsay grounds. The trial court sustained the objection. Pace claims that the trial court erred because the rules of evidence are relaxed in the sentencing phase of a capital trial. See *Barnes*, 269 Ga. at 357 (27). However, the hearsay rule is not suspended in the sentencing phase, and the defense made no proffer to enable this Court to determine if the mitigating influence of the excluded testimony outweighed the harm from a violation of the hearsay rule. See *Smith*, 270 Ga. at 248-249 (12). Under these circumstances, we find no error.

31. In the sentencing phase, the admission of non-statutory aggravating evidence about several previous burglaries and other offenses committed by Pace was not error. *Jefferson v. State*, 256 Ga. 821 (8) (353 SE2d 468) (1987) (evidence of prior crimes, even if non-adjudicated, is admissible in the sentencing phase). The State presented reliable evidence about these offenses and there is no requirement that other crime evidence in the sentencing phase be proven beyond a reasonable doubt. *Ross v. State*, 254 Ga. 22 (5) (d) (326 SE2d 194) (1985).

32. Pace complains that several parts of the prosecutor's sentencing phase closing argument were reversible error.

(a) *Use of a cartoon.* The prosecutor used a cartoon as a visual aid during his argument. The cartoon depicted a jury returning a verdict of "not guilty by reason of insanity, ethnic rage, sexual abuse, you name it." The prosecutor argued, with regard to the cartoon, that Pace was going to use his upbringing to claim that "it's everybody else's fault that he turned into a serial killer but his own." The prosecutor told the jury "not to go for that." Pace objected that the cartoon

injected extrinsic, prejudicial matters into the trial, such as the defendant's race and social status, and moved for a mistrial. The trial court denied the motion for mistrial, after noting that one of Pace's witnesses, a minister, had testified that Pace's community is a poor, African-American community where people "know how the death penalty has been used." We find no error. The permissible range of closing argument is wide and counsel's " 'illustrations may be as various as are the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wing to his imagination.' " *Conner*, 251 Ga. at 122 (6), quoting *Mitchum v. State*, 11 Ga. 615, 631 (1852). What counsel may not do is inject extrinsic, prejudicial matters that have no basis in the evidence, but Pace did present evidence about his childhood and community. See *Conner*, supra. We also will not assume that the prosecutor intended his remarks to have their most damaging (and erroneous) meaning. See *Donnelly v. DeChristoforo*, 416 U. S. 637, 647 (94 SC 1868, 40 LE2d 431) (1974). After reviewing the use of the cartoon in context, we conclude that the prosecutor did not exceed the permissible range of argument by using it to briefly urge the jury to hold Pace solely responsible for his crimes, and to not be swayed by excuses for his behavior. See *Conner*, supra.

(b) *Comparison to other serial killers.* The prosecutor compared Pace to serial killers like Bundy and Dahmer when arguing that the families of these serial killers would have also said nice things about them when they were children. Under these circumstances, this is not an improper argument. See *Robinson v. State*, 257 Ga. 194 (4) (357 SE2d 74) (1987). The trial court sustained Pace's objection to the mention of the sentences received by these other killers, and the trial court issued curative instructions which cured any error that could result from that comment. See *Mobley v. State*, 265 Ga. 292 (19) (455 SE2d 61) (1995).

(c) *Intent to rape a girl.* The State presented aggravating evidence that Pace had previously broken into a home and, armed with a knife, told a 15-year-old girl to take her clothes off. No sexual assault occurred because the girl faked an asthma attack. It was a reasonable inference that he intended to rape her. See *Todd*, 261 Ga. at 768 (3) (a).

(d) *Easy life in prison.* The State's argument that Pace should not be spared so he could get free room and board and a television in prison is not improper. See *Williams v. State*, 258 Ga. 281 (7) (368 SE2d 742) (1988). The prosecutor's gratuitous remark that "if anal sodomy is your thing, prison isn't a bad place to be" was unprofessional. However, Pace did not object to this comment and there is no reasonable probability that this improper, isolated comment changed the result of the sentencing phase. See *Hicks v. State*, 256 Ga. 715

(23) (352 SE2d 762) (1987).

(e) *Comment on Pace's right to silence.* The prosecutor frequently asked mitigation witnesses who had spoken or corresponded with Pace after his arrest whether he had ever expressed remorse or said he was sorry. The prosecutor then argued in closing that Pace had never repented or said he was sorry. Pace objected, but the trial court found that this argument was not a comment on Pace's right to remain silent. Under these circumstances, we conclude that the trial court did not err. See *Ledford v. State,* 264 Ga. 60 (18) (b) (439 SE2d 917) (1994); *Ranger v. State,* 249 Ga. 315 (3) (290 SE2d 63) (1982).

(f) *Deterrence.* It was not improper for the prosecutor to argue that a death sentence would "send a message" and deter other killers. See *McClain v. State,* 267 Ga. 378 (4) (a) (477 SE2d 814) (1996).

(g) *Religious reference.* The prosecutor told the jury that he anticipated that Pace's counsel would tell a New Testament parable about forgiveness and mercy, and he argued that there should not be forgiveness unless there is remorse. The prosecutor also stated in a different part of his argument that some of the jurors had said they believed in an "eye for an eye" during voir dire and that the State was now asking for an eye for an eye. Pace did not object to any religious references by the prosecutor, and the prosecutor did not argue that divine law called for a death sentence. The religious references in this case do not rise to the level of the inflammatory argument made in *Hammond v. State,* 264 Ga. 879 (8) (c) (452 SE2d 745) (1995). Therefore, after reviewing the entire argument and sentencing phase of trial, we conclude that these comments did not change the jury's exercise of discretion from life imprisonment to a death sentence. *Hammond,* supra; *Hicks,* supra.

(h) *Putting jury in the victims' shoes.* The prosecutor told the jury to "imagine being asleep, and you wake up to hands tearing off your clothes. You wake up to hands grappling your body. . . . Something is tied around your neck and you are strangled." It is well settled that it is improper to ask the jury to imagine themselves in the victim's place. See *Greene v. State,* 266 Ga. 439 (19) (c) (469 SE2d 129) (1996); *Burgess v. State,* 264 Ga. 777 (20) (450 SE2d 680) (1994). However, Pace did not object to this improper argument and, given the amount of evidence in aggravation, we do not conclude that this argument changed the result of the sentencing phase. *Hicks,* supra.

(i) *Simulated tearing of a Georgia law book.* At the conclusion of his argument, the prosecutor picked up a book, apparently Title 17 of the Official Code of Georgia Annotated, and said: "This is a Georgia law book which has the punishments and the crimes in it. If based on the evidence in this case, you don't return a death penalty verdict, you have snatched that section of the book about the death penalty out." The prosecutor then simulated tearing out a section of the book.

Pace objected, claiming that the law provides how and why the death penalty may be imposed, that the jury would be instructed on the law, and that the prosecutor's argument comes close to "reading the law." The trial court overruled the objection. We find no error. Viewed in context, the prosecutor was arguing that if this severe case does not result in a death sentence, no case could possibly result in a death sentence. It is not improper for the State to argue that the defendant deserves the harshest penalty, see *Carr v. State*, 267 Ga. 547 (8) (b) (480 SE2d 583) (1997), and the prosecutor's argument cannot be reasonably construed as "reading the law." See *Conklin v. State*, 254 Ga. 558 (10) (331 SE2d 532) (1985). Prosecutors are afforded considerable latitude in imagery and illustration when making their arguments. See *McClain*, 267 Ga. at 385 (4) (a).

33. The trial court's sentencing phase jury charge was not improper. OCGA § 17-10-30 (b) (2), (4), (7); *West v. State*, 252 Ga. 156 (2) (313 SE2d 67) (1984). The death penalty for rape is not unconstitutional when the victim is killed. *Moore v. State*, 240 Ga. 807, 822 (243 SE2d 1) (1978). If the aggravating circumstances found by the jury in support of a death sentence for rape are eliminated because they allegedly overlap with the aggravating circumstances supporting the death sentences for the murders, there are still sufficient statutory aggravating circumstances to support all four death sentences. See id. We further note that the trial court sentenced Pace to life imprisonment for each rape count.

34. Life imprisonment without parole was not a sentencing option at Pace's trial. OCGA § 17-10-16 (a). Therefore, it was not error for the trial court to prevent Pace from asking questions about parole during voir dire, *Burgess v. State*, 264 Ga. 777 (3) (450 SE2d 680) (1994), and to deny argument or the presentation of evidence about Pace's parole eligibility. See *Jenkins*, 269 Ga. at 293-294 (21). The trial court's response to a jury note about whether life without parole was a possible sentence was appropriate and not error. See *Potts v. State*, 261 Ga. 716 (24) (410 SE2d 89) (1991); *Quick v. State*, 256 Ga. 780 (9) (353 SE2d 497) (1987). The transcript contains no colloquy between the parties and the trial judge about the note, but the trial court's written (and correct) response to the jury is in the record and we therefore conclude that Pace shows no harm from the failure to transcribe the colloquy. See *Carr*, 267 Ga. at 551 (2).

35. Evidence on the nature of execution by electrocution is not admissible in the sentencing phase. *Smith*, 270 Ga. at 250-251 (16).

36. Although the prosecutor made several improper comments during closing argument in both phases of the trial, we conclude, given the overwhelming evidence of Pace's guilt and the enormous amount of evidence in aggravation, that the death sentences in his case were not imposed under the influence of passion, prejudice, or

any other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentences are also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The cases listed in the Appendix support the imposition of the death penalty in this case as they all involve the murder of more than one person or a murder committed during the commission of a rape or burglary.

*Judgment affirmed. All the Justices concur, except Benham, C. J., who concurs in the judgment and in all Divisions except 35, and Fletcher, P. J., Sears, J., and Hunstein, J., who concur in part and dissent in part.*

SEARS, Justice, concurring in part and dissenting in part.

I concur in the majority's affirmance of appellant's adjudication of guilt. However, for the reasons explained in my partial concurrence and partial dissent in *Wilson v. State*,[4] I would stay ruling on the constitutionality of appellant's sentence of death by electrocution until receiving guidance from the United States Supreme Court on that issue.[5]

HUNSTEIN, Justice, dissenting in part.

Now, come with me to that scene of the crime. Imagine that night. Ms. McAfee is laying in bed asleep. She is violently awakened by somebody standing over her. Somebody grabbing at her. If you could imagine being asleep, and you wake up to hands tearing off your clothes. You wake up to hands grappling your body. And just as you wake up and realize what's going on, your clothes are ripped from you. Something is tied around your neck, and you are strangled.

This is the argument the prosecution used to persuade the jury to sentence Pace to death. The prosecutor did not stop with Ms. McAfee but continued this argument when he invited the jury to imagine themselves in the place of the next victim:

So come with me and think about [the next] crime scene. How would you feel in Ms. McClendon's situation? Again, to wake up with some man standing up over you choking the life out of you and pulling on your clothes.

---

[4] 271 Ga. 811, 824 (525 SE2d 339) (1999).

[5] In all capital cases, this Court is obligated to undertake a sua sponte review of the death sentence to determine, among other things, whether the penalty is excessive. OCGA § 17-10-35. "This penalty question is one of cruel and unusual punishment, and is for the court to decide" in all cases. *Blake v. State*, 239 Ga. 292, 297 (236 SE2d 637) (1977).

Any argument "which importunes the jury to place itself in the position of the victim for any purpose must be carefully scrutinized to ensure that no infringement of the accused's fair trial rights has occurred." (Citations and punctuation omitted.) *McClain v. State*, 267 Ga. 378, 383 (3) (a) (477 SE2d 814) (1996). "The 'Golden Rule' argument, suggesting to jurors as it does that they put themselves in the shoes of one of the parties, is generally impermissible because it encourages the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." 75A AmJur2d, Trial, § 650, p. 260. See also *Hayes v. State*, 236 Ga. App. 617 (3) (512 SE2d 294) (1999); *Horne v. State*, 192 Ga. App. 528 (2) (385 SE2d 704) (1989). Georgia law has clearly and repeatedly disapproved the use of the golden rule argument by prosecutors in criminal cases. See, e.g., *Greene v. State*, 266 Ga. 439 (19) (c) (469 SE2d 129) (1996); *McClain*, supra; *Burgess v. State*, 264 Ga. 777 (20) (450 SE2d 680) (1994); *Hayes*, supra; *Heller v. State*, 234 Ga. App. 630 (4) (507 SE2d 518) (1998).

Where, as here, no objection was made to the prosecutor's golden rule argument, this Court must "determine whether there is a reasonable probability the improper argument changed the outcome of the sentencing proceeding. [Cit.]" *Carr v. State*, 267 Ga. 547, 556 (8) (a) (480 SE2d 583) (1997). The majority dismisses this issue by peremptorily holding that "given the amount of evidence in aggravation, we do not conclude that this argument changed the result of the sentencing phase. [Cit.]" Majority opinion, Division 32 (h). The problem with this conclusion, however, is that the jury was not contemplating whether to find Pace guilty or innocent, but whether to sentence Pace to death or impose a life sentence. While the amount of evidence of guilt may be so overwhelming that no reasonable probability exists that the use of a golden rule argument affected the outcome in the guilt-innocence phase, *Greene, Burgess*, supra, the jury in the sentencing phase has moved beyond weighing evidence into weighing imponderables. When faced with the effect of an impermissible argument, the "amount of evidence" may ensure that confidence in the outcome of the guilt-innocence phase was not undermined; however, the impact of improper argument on a jury's consideration of mercy cannot be as easily quantified. "[T]he 'exercise of mercy . . . can never be a wholly rational, calculated, and logical process. [Cit.]'" *Conner v. State*, 251 Ga. 113, 121 (303 SE2d 266) (1983).

In order to determine whether there is a reasonable probability that, but for an improper argument, a death verdict would not have been given, the reviewing court must evaluate the improper remarks in the context of the entire proceeding. *Brooks v. Kemp*, 762 F2d 1383, 1413 (V) (11th Cir. 1985). In this case, the prosecutor deliber-

ately used an argument which was prohibited by well-established Georgia case law. The argument was neither isolated nor unintentional. The argument unambiguously invited the jurors to imagine themselves in the place of two crime victims. The improper argument was not mitigated by other arguments made by the State or by any instruction by the court. Compare *Ford v. State*, 255 Ga. 81 (8) (i) (335 SE2d 567) (1985); *Brooks v. Kemp*, supra. Furthermore, the record in this case establishes that the jury was not so appalled by the crimes committed by Pace that they rejected out of hand any sentence other than death. Rather, the record establishes that the jury remained open to the possibility of a life sentence, as evidenced by the question they sent to the trial court during their sentencing deliberations regarding the possibility of a sentence of life without parole. See Majority opinion, Division 34.

The prosecutor's golden rule argument was dramatic in its details and was uttered for the purpose of prejudicing the jury against exercising mercy in its sentencing decision. See OCGA § 17-10-35 (c) (1). While I support giving prosecutors wide latitude in their choice of style, tactics and language used in closing argument, Georgia law clearly prohibits prosecutors from urging jurors to imagine themselves in the victim's place. "Wide latitude" does not justify the prosecutor's impermissible use of the golden rule argument under the facts of this case.

Based on the State's deliberate and extensive introduction of a prohibited argument into the closing of Pace's capital sentencing hearing, the absence of any factors to mitigate that impermissible argument, and indicators that the evidence of Pace's guilt did not automatically predispose the jury to consider only a death sentence, I would hold that the prosecutor's use of the golden rule argument here undermined confidence in the outcome of the sentencing proceeding, i.e., that there is a "'reasonable probability that the improper arguments changed the jury's exercise of discretion in choosing between life imprisonment or death.' [Cit.]" *Ford*, supra, 255 Ga. at 94. I would therefore conclude that the improper argument rendered Pace's capital sentencing hearing fundamentally unfair. *Brooks v. Kemp*, supra, 762 F2d at 1416. Accordingly, I must respectfully dissent to the majority's affirmance of Pace's death sentence. I concur in the affirmance of Pace's convictions.

I am authorized to state that Presiding Justice Fletcher joins this dissent.

APPENDIX.

*Gulley v. State*, 271 Ga. 337 (519 SE2d 655) (1999); *Pruitt v. State*, 270 Ga. 745 (514 SE2d 639) (1999); *Pye v. State*, 269 Ga. 779

(505 SE2d 4) (1998); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State*, 268 Ga. 623 (491 SE2d 791) (1997); *Wellons v. State*, 266 Ga. 77 (463 SE2d 868) (1995); *Gary v. State*, 260 Ga. 38 (389 SE2d 218) (1990); *Pitts v. State*, 259 Ga. 745 (386 SE2d 351) (1989); *Isaacs v. State*, 259 Ga. 717 (386 SE2d 316) (1989); *Foster v. State*, 258 Ga. 736 (374 SE2d 188) (1988); *Blankenship v. State*, 258 Ga. 43 (365 SE2d 265) (1988); *Ross v. State*, 254 Ga. 22 (326 SE2d 194) (1985); *Devier v. State*, 253 Ga. 604 (323 SE2d 150) (1984); *Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Waters v. State*, 248 Ga. 355 (283 SE2d 238) (1981).

DECIDED DECEMBER 3, 1999 —
RECONSIDERATION DENIED DECEMBER 20, 1999.

*Michael Mears, Charlotta Norby,* for appellant.
*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Peggy R. Katz, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Allison B. Goldberg, Assistant Attorney General,* for appellee.